Harold E. KOHN, Trustee, et al.

v.

AMERICAN METAL CLIMAX, INC., et al., Appellants in 19175, 19537, 71–1099.

Appeal of ROAN SELECTION TRUST, LIMITED, in 19176, 19538, 71–1100.

Appeal of Harold E. KOHN, Trustee, et al., in 71–1101.

Nos. 19175, 19176, 19537, 19538, 71–1099, 71–1100, 71–1101.

United States Court of Appeals, Third Circuit.

Argued April 20, 1971.

Further Briefing Completed on Oct. 14, 1971.

Decided March 31, 1972.

As Amended April 17, 1972.

256

See also 313 F.Supp. 1251.

Marvin Schwartz, Sullivan & Cromwell, New York City, for appellant in

Nos. 19175, 19176, 19537, 19538, 71–1099, 71–1100 and appellee in No. 71–1101.

Harold E. Kohn, Philadelphia, Pa., for appellant in No. 71–1101 and appellee in Nos. 19175, 19176, 19537, 19538, 71–1099, 71–1100.

Before SEITZ, Chief Judge, and ADAMS and MAX ROSENN, Circuit Judges.

· OPINION OF THE COURT

SEITZ, Chief Judge.

These are consolidated appeals from orders of the United States District Court for the Eastern District of Pennsylvania.

The case arises out of the amalgamation of defendants Roan Selection Trust Limited (RST), a Zambian corporation, into American Metal Climax, Inc. (AMAX), a New York corporation, which prior to the consummation of the amalgamation owned 42.3% of the outstanding stock of RST.

The facts as found by the district court indicate that on August 11, 1969, the President of the Republic of Zambia issued the "Matero Declaration" which expressed the Government's intention to acquire a controlling equity interest in operating copper properties within Zambia. At that time RST was a corporation organized under the laws of Zambia and had its principal place of business in that country. Its operations involved primarily the production, smelting and refining of Zambian copper.

After issuance of the declaration, between August 11, 1969, and November 17, 1969, RST negotiated the sale of a 51% interest in its operating assets to the Zambian Government. The chief concern of the corporation in the negotiations was to secure from the Government the right to transfer the corporate domicile and externalize the corporation's non-operating assets. In this manner a significant part of RST's total worth would be free from Zambian exchange controls.

On November 17, 1969, the board of directors of RST approved, in principle, an agreement among RST, the Government of Zambia, and a Zambian dominated corporation called the Industrial Development Corporation of Zambia (INDECO). The agreement provided, inter alia, that:

(a) the mining operations of RST would be merged into a company to be formed under the name Roan Consolidated Mining, Ltd. (RCM) in which INDECO would own 51% and RST would own 36.75%. The remaining 12.-25% would be held by other companies known as the Anglo-American Group. These firms maintained a substantial minority interest in certain RST subsidiaries;

(b) INDECO would issue negotiable bonds, guaranteed by the Zambian Government, in the amount of $151 million and RST would be entitled to receive 36.75% of the total issue;

(c) RST, or a company nominated by it, would manage the operations of RCM and act as sales agent for a period of not less than ten years during which period RST or its nominee would receive 1½% of RCM's gross sales revenues and 2% of its profits net of mineral taxes but before income taxes;

(d) the holder of the management contract would maintain a holding of not less than 20% of RCM's outstanding stock;

(e) RCM would pay quarterly dividends, not subject to any restrictive limitation and equal to the net income of RCM after provision for a reserve for exploration and development in an amount approved by the entire RCM board; and

(f) all assets of RST, except those nationalized by Zambia, might be transferred to a new corporation outside Zambia and would consist principally of cash approximating $60 million; a 30% interest in Botswana RST, Ltd. (a Botswanian corporation the assets of which were primarily majority interests in two Botswanian mining companies);

Ametalco (a group of corporations wholly owned by RST International Metals Ltd. which, in turn, was a wholly owned subsidiary of RST); the INDECO bonds; and RST's interest in RCM.

Seeking alternative means by which to externalize the RST assets not nationalized by the Zambian Government, the RST board eventually began negotiations with AMAX, a New York corporation. On March 5, 1970, a committee of the RST board approved in principle an agreement to effect the externalization through an amalgamation of RST with AMAX. The agreement provided, inter alia, for:

(1) the consolidation of RST's Zambian operating assets into RCM, 51% of which would be sold to INDECO in exchange for INDECO bonds;

(2) the pro rata distribution to all RST shareholders of (a) the INDECO bonds thus acquired; (b) RST's shareholdings in Botswana RST Ltd.; and (c) RST shareholdings in RCM, except for the 20% interest required to be held by RST or its nominee under the management provision of the Zambian agreement; and

(3) the acquisition of the remainder of RST by AMAX, for which non-AMAX shareholders of RST would be paid approximately $76 million principal amount of 8% AMAX subordinated debentures with common stock warrants attached and $6.3 million in cash.

On April 8, 1970, plaintiff Kohn, as trustee of American Depositary Receipts representing 2000 shares of RST, filed a complaint against the defendants derivatively on behalf of RST and also as representative of all non-AMAX shareholders of RST. Seeking to enjoin the proposed amalgamation, he alleged the following in his complaint:

(1) defendants had violated the disclosure provisions of section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder;

(2) the proposed amalgamation would violate section 7 of the Clayton Act, 15 U.S.C. § 18; and

(3) the terms of the amalgamation evidenced a fraud on non-AMAX shareholders of RST, were unfair to these shareholders' interests in the corporation, and demonstrated a breach of fiduciary duty by AMAX, as a controlling RST shareholder.

The approval of both the High Court of Zambia and the RST shareholders was necessary before the amalgamation could be effected. On July 8, 1970, the district court enjoined the distribution of proxy material to RST shareholders, unless defendants included therewith a letter prepared by plaintiff Kohn setting forth his bases for claiming that the proposed amalgamation was unfair. The Court's order specifically provided that inclusion of Kohn's letter was "without prejudice to plaintiffs' claims that [the proxy material] was in substance materially misleading or otherwise violative of Section 10(b) and . . . Rule 10b–5. . . ." This condition was met and the shareholders were sent an Explanatory Statement with Appendices setting forth the details of the RST–AMAX reorganization.

The proxy materials which the shareholders received presented the amalgamation agreement and the Zambian nationalization in the form of one resolution. Thus, there was no opportunity to approve the transfer of RST assets from within Zambia without also endorsing the agreement negotiated between RST and AMAX. At the meeting held August 6, 1970, RST shareholders voted on the resolution. The vote was 85.5% in favor and 14.5% opposed. After this vote was taken the non-AMAX shareholders of RST were polled again as a distinct voting group. The tally of this vote was 66% in favor and 34% opposed.

The way was now clear for presenting the proposed plan of externalization to the High Court of Zambia for its approval. But on August 12, 1970, the district court preliminarily enjoined this presentation, finding that the plaintiff Kohn had demonstrated a strong probability that upon final hearing he would

be granted relief and that effectuation of the amalgamation would only complicate the formulation of an appropriate remedy. The following day, however, this court stayed the effect of the district court's order on the condition that defendant AMAX deposit with the court $10 million as security for any injury plaintiffs might suffer. The stay also required that the non-liquid assets of RST be frozen and neither transferred nor assigned until further order of the court.

Thereafter, on August 14, 1970, the High Court of Zambia approved the reduction of capital necessary to complete the amalgamation. This approval was registered on August 15, 1970, and had the effect of cancelling and rendering void all issued shares of RST other than those held by AMAX and its nominees. On August 31, 1970, this court amended its previous order to permit the transfer of RST's externalized assets to RST International, Inc., a Delaware subsidiary of AMAX.

There followed a lengthy trial and, on November 25, 1970, the district court filed its Findings of Fact, Opinion, Conclusions of Law, and Order. The court essentially found that: (1) the High Court of Zambia's confirmation of the reduction of capital did not bar the plaintiffs' claims challenging the amalgamation; (2) the amalgamation was unfair to the non-AMAX shareholders of RST; (3) certain directors of RST, and AMAX as a controlling shareholder of RST, breached their fiduciary duty owed to non-AMAX shareholders of RST; (4) the Explanatory Statement and Appendices sent to RST shareholders was deliberately misleading and thereby violated Section 10(b) of the Securities Exchange Act as well as Rule 10b–5; and (5) plaintiffs failed to prove any violation of the Clayton Act. Plaintiffs were granted injunctive relief and the

defendants were ordered to offer plaintiffs as a class, in accordance with each class member's interest in RST as of March 5, 1970, a pro rata share in RST International, Inc.

Defendants AMAX and RST immediately appealed the district court's order of November 25, 1970. Shortly thereafter, on December 3, 1970, plaintiffs filed a motion in the district court requesting that the November 25th order be amended and supplemented. Our court, on motion remanded the record to the district court to permit it to rule on plaintiffs' motion. Thereafter, beginning on January 15, 1971, the district court entered three supplementary orders.

It stayed its earlier order in part, directed the distribution of certain dividend arrearages and accumulated interest and ordered supplemental hearings on the propriety of additional or alternative relief to that specified in the previous order. Kohn v. American Metals Climax, Inc., 322 F.Supp. 1331 (E.D.Pa.1971). Appeals by both sides followed.

## APPEALABILITY

This court raised sua sponte the question of whether it has jurisdiction to entertain these appeals. On November 25, 1970, after the close of the trial in this case, the district court ordered rescission of the reorganization in the form of a tender offer to RST's former shareholders. It left open "until after any appeal from its decision the details of implementation." Both RST and AMAX appealed (Nos. 19537 & 19538).[1] Then, while expressly retaining jurisdiction, this court remanded the case to permit the district court to rule on plaintiffs' pending Motion to Amend and Supplement the Judgment. The district court sustained the motion and by order dated January 15, 1971 amended its order

---

1. On August 12, 1970, both RST and AMAX appealed from the district court's order preliminarily enjoining presentation of RST's reorganization plan before the High Court of Zambia (Nos. 19175 & 19176). This court stayed that order on August 13th. We think these appeals have become moot due to the pending judgment on the merits.

of November 25th to provide, inter alia, for "supplementary proceedings to determine whether any further *or different* relief [was] appropriate," (emphasis added). 322 F.Supp. at 1366, 1369. Defendants appealed this order also and plaintiffs cross-appealed (Nos. 71–1099, –1100 and –1101).

We think these appeals lie pursuant to 28 U.S.C. § 1292(a) (1), which authorizes appeals from interlocutory orders "granting, continuing, modifying, refusing or dissolving injunctions. . ." The order of November 25, 1970, was at least in part such an order. It provided, inter alia:

(1) that AMAX offer to non-AMAX shareholders of defendant RST a pro rata share in RST, International;

(2) that AMAX be enjoined from causing its agent to mail the transmittal letter to the RST shareholders; and

(3) that AMAX be enjoined from withdrawing from the Court the $10 million in security theretofore deposited.

The January, 1971 orders continued several of these injunctive provisions (e. g., those that enjoin withdrawal of the $10 million in the escrow account). In addition, these orders originated several injunctive provisions, namely: those relating to the payment of dividends on several classes of securities and to the undertaking of the effort and expense of investigating alternatives to the plan proposed before the Zambian government.

 These provisions are injunctions within the meaning of section 1292 (a) (1). *Cf.* Sims v. Green, 160 F.2d 512 (3d Cir. 1947). *See also* Dilworth v. Riner, 343 F.2d 226 (5th Cir. 1965). Given jurisdiction over these aspects of the district court's orders we can review the merits of the entire case as it now rests. *See* Smith v. Vulcan Iron Works, 165 U.S. 518, 525, 17 S.Ct. 407, 41 L.Ed. 810 (1897). *See also* Highland Avenue & Belt Rr. Co. v. Columbian Equip. Co., 168 U.S. 627, 630, 18 S.Ct. 240, 42 L.Ed. 605 (1898). As stated by the *Smith* Court, in construing the statute which

section 1292(a) (1) succeeded, this provision authorizes, "according to its grammatical construction and natural meaning, an appeal to be taken from the whole of such interlocutory order or decree, and not from that part of it only which grants or continues an injunction." 165 U.S. at 525, 17 S.Ct. at 410. *Accord* Allstate Insurance Co. v. McNeill, 382 F.2d 84, 87–88 (4th Cir. 1967) (construing 28 U.S.C. 1292(a) (1)). See also Wright, Federal Courts 400 (1963).

We conclude that the orders of November 25, 1970 as amended by the January orders are appealable. We proceed to consider the district court's holding that in several respects RST's proxy materials violated Rule 10b–5.

## 10b–5 VIOLATIONS

### A. CREATING THE FALSE IMPRESSION THAT THE AMAX-RST AMALGAMATION WAS A NECESSARY CONSEQUENCE OF THE NATIONALIZATION

The district court held that RST's proxy materials inaccurately portrayed the proposed amalgamation between AMAX and RST. In reaching its decision the court relied principally on the misleading manner in which the nationalization and amalgamation plans were presented. It found that the proxy materials, particularly the descriptive language contained in the initial pages of the Explanatory Statement, were designed to create the false impression that the amalgamation, on the basis of the terms specified by the explanatory materials, was an inevitable consequence of Zambian nationalization. Thus, fraud was found.

Obviously, if nationalization appeared unavoidably imminent and the proxy materials were interpreted as meaning that the proposed amalgamation was the sole method of externalization presently acceptable to the Zambian government, the RST shareholders predictably would not question the absence of alternative proposals for externalization which might be more advantageous to non-AMAX interests. In concluding that such was the

intended design of the proxy presentation, the district court based its conclusion primarily on the following passages from the introductory pages of the Explanatory Statement:

"This Explanatory Statement describes the proposal of the RST Board that the shareholders of RST approve this sale to Zimco (the nationalization) *as part* of their approval of a reorganization of the structure of the RST Group . . . (emphasis supplied)

At an early stage of this consideration, Amax raised with RST the possibility of an amalgamation of part of the RST Group into Amax, with a distribution of other RST assets and AMAX securities to the other RST shareholders, as a means of effecting a reorganization to meet the foregoing considerations . . .

Approval is being sought from RST shareholders of the foregoing proposal as a whole. Under the law of Zambia, this proposal, since it involves a reduction of capital of RST, cannot become effective unless confirmed by the High Court for Zambia after it has been approved by the shareholders of RST by a special resolution.

Accordingly, this distribution will enable such RST shareholders to the maximum extent permitted to continue an interest in the Zambian mining operations directly and subject to generally the same tax laws and treaty considerations as pertain to their present RST shares . . . while receiving the other assets being distributed to them free of Zambian exchange control restrictions; and to the extent RST shareholders obtain AMAX common stock by exercising the AMAX Warrants being distributed, they will secure through AMAX an interest in such portion of RCM as AMAX may own.

The Board believes it has a duty to point out to shareholders that, if the Resolutions are not approved by the shareholders, the Board of RST must continue to work with representatives of Zambia for the acquisition by Zambia of 51% interest in the Zambian mining, smelting and refining operations of its subsidiaries in accordance with the announced policy of Zambia to acquire such an interest. The Board believes that the results of such a course would be substantially less in the interests of shareholders than the present proposal."

■ Defendants contend that certain parts of the materials, other than those quoted above, accurately point out that amalgamation and nationalization were independent. We have reviewed the materials and do not agree with this contention. Indeed, an examination of the proxy materials suggests that its authors made a studied effort to avoid stating explicitly that either amalgamation and nationalization were absolutely independent or they were absolutely interdependent. Of course, it is the defendants' position that regardless of this observation it was not necessary for the materials to state specifically that the two transactions were independent, since "manifestly and obviously the Zambian government would have no conceivable reason to *require* that RST distribute assets to its shareholders, amalgamate with AMAX, or exercise its contractual right to remove its assets from Zambian jurisdiction." The point is, however, that the proxy materials made such a "manifest and obvious" impression unreasonable since they suggested to the reader that amalgamation and nationalization were required to be a unitary package. The fact that defendants can demonstrate that the Zambian government had no reason to require that RST distribute assets to the shareholders is not sufficient to overcome the effect of the language employed in the proxy materials. We therefore agree with the district court that the language of the Explanatory Statement impermissibly suggests that nationalization and amalgamation were interdependent and, under the circumstances, was a material misrepresentation.

### B. LINKING AMALGAMATION AND NATIONALIZATION IN A UNITARY PROPOSAL TO THE SHAREHOLDERS

Amalgamation and nationalization were presented for a shareholder vote as a unitary proposal. Shareholders could not approve one while rejecting the other. The choice was to accept both or to reject both. The district court found that this unitary presentation, without the proponents thereof giving reasons therefor, was a manipulative scheme to coerce shareholder approval of the amalgamation. It concluded that this linking reinforced the false impression that the two actions were interdependent.

The defendants contend that compelling business reasons dictated that the proposals be presented in unitary form. The foundation for these compelling reasons was that if the shareholders approved the nationalization agreement but rejected the amalgamation, Zambia then would have nationalized RST's property without RST having taken advantage of its bargained-for right to externalize its non-nationalized assets. In other words, if nationalization and externalization did not proceed simultaneously, the RST assets remaining non-nationalized would be subject to substantial political risks.

■ Defendants' argument fails to explain why RST could not have sought approval of the externalization plan first, followed by nationalization. It also.does not explain why alternative externalization plans could not have been presented simultaneously with the plan for nationalization. In any event, we agree with the district court that it was a material violation not to have disclosed to the shareholders the alleged compelling business reasons for presenting the proposals in one package.

### C. THE IMPLICATION THAT SHAREHOLDER APPROVAL WAS PREREQUISITE TO NATIONALIZATION

We have serious doubt as to the correctness of this ruling by the district court. However, because this issue is closely connected with the violation found concerning the linking of the amalgamation and nationalization proposals and because of our agreement with some of the lower court's findings of other violations of Rule 10b–5, we do not decide whether the district court correctly decided that defendants' proxy materials violated the Rule by implying that shareholder approval was prerequisite to nationalization.

### D. FAILURE TO DISCLOSE THAT EXTERNALIZATION WAS DISCRETIONARY AND NEED NOT HAVE BEEN SIMULTANEOUS WITH NATIONALIZATION

■ The district court also found that RST should have disclosed in the proxy materials that externalization of assets was discretionary under the agreement with Zambia and, if approved, need not have been simultaneous with nationalization. The court held that failure to disclose this fact violated Rule 10b–5 because it contributed to creating the false impression that amalgamation was required to be concomitant with nationalization. We agree.

### E. FAILURE TO DISCLOSE ALTERNATIVE PLANS FOR EXTERNALIZATION

The district court found the failure of the proxy materials to disclose that RST had considered plans for externalization other than the proposed amalgamation of RST and AMAX to be a material omission. Likewise, it found the failure of the materials to note that, in fact, one such alternative involving RST's becoming an international mining house had been approved by the RST Board before the AMAX transaction was negotiated also to be violative of the Rule. Because the underlying findings of the district court are somewhat inconsistent and because we have sustained several other findings of Rule 10b–5 violations, we do not decide whether failure to disclose alternatives was a material omission in the proxy.

## F. FAILURE OF THE PROXY MATERIALS TO ADEQUATELY DISCLOSE THE BASIS UPON WHICH RST'S ASSETS WERE EVALUATED

The district court held that a "clear presentation of the values assigned the RST assets . . . and the basis upon which the evaluations were made were crucial to an informed shareholder vote, and the omission of these facts from the explanatory materials was material." The court suggested that the proxy materials intentionally contained no presentation of RST's asset values because these assets were substantially undervalued by the terms of the AMAX–RST negotiations.

■ Ordinarily the SEC and the courts discourage presentations of future earnings, appraised asset valuations and other hypothetical data in proxy materials. *See* Union Pac. R. v. Chicago & Nw. Ry., 226 F.Supp. 400, 408–09 (N.D. Ill.1964). *But see* Gerstle v. Gamble-Skogmo, Inc., 298 F.Supp. 66 (EDNY 1969) (presentation of book value misleading when substantially less than fair market value). We think this general rule should apply here. No truly reliable estimates of value ever materialized. The figures which the district court concluded should have been disclosed were all advanced by the parties during negotiations only and as part of their bargaining strategies. Under such circumstances we think the district court was not warranted in concluding that the omission from the proxy materials of the RST asset valuations was material.

## G. INADEQUATE DISCLOSURE OF THE UNIQUE BENEFITS AMAX WAS TO OBTAIN INCIDENT TO THE AMALGAMATION

■ The district court found that the benefits AMAX was to obtain as a result of the amalgamation were inadequately disclosed to the RST shareholders. In view of the close ties between AMAX and RST we agree that such disclosure would have been particularly important. The benefits accruing to AMAX included: (1) an increase of $7 million in annual income; (2) an improvement of $134 million in cash-flow during the period 1970 to 1975; (3) an improvement of $91 million in the corporation's balance of payments; and (4) the acquisition of high-yielding assets. We think the district court was justified in concluding that the piecemeal presentation of these benefits scattered throughout the proxy materials and the appendices was inadequate disclosure under the securities laws.

■ Defendants contend that although their own presentation may indeed have been piecemeal, the shareholders were fully apprised of the benefits accruing to AMAX by means of the letter of plaintiff Kohn which was included in the proxy materials sent pursuant to court order and which urged the shareholders to vote against the proposal. It is true that proxies need not contain information contained in other solicitation material as long as the proxies clearly refer to such other material. *See* Rule 14a–5, 17 C.F.R. § 240.14a–5(c). But a reading of Rule 14a–5 in its entirety reveals that its sole purpose is to control the manner of presentation of data within proxies. It is aimed at reducing repetition within materials sent to stockholders. It does not authorize opposing sides in proxy contests to use one another's materials by reference. Consequently, any otherwise material violation of the disclosure rules is not obviated by referring to materials of an opposing soliciting party. The result is the same even if the issue is considered apart from Rule 14a–5. If McConnell v. Lucht, 320 F. Supp. 1162 (SDNY 1970), can be read to the contrary, we disagree with it.

Indeed, of decisive importance here, Kohn's letter set forth his attack on the fairness of the amalgamation. He did not purport to set forth the other material misrepresentations in the proxy statement. His position on this point was preserved in the court's order.

## H. STATEMENT THAT RST SHARE-HOLDERS WOULD, BY VOTING FOR THE PROPOSAL, OBTAIN THE MAXIMUM POSSIBLE INTEREST IN ZAMBIAN MINING OPERATIONS

The district court found misleading the language in the proxy materials to the effect that the proposal allowed the RST shareholders to continue their direct interest in Zambian mining operations "to the maximum extent permitted." The Statement claimed:

Accordingly, this distribution will enable such RST shareholders to the maximum extent permitted to continue an interest in the Zambian mining operations directly and subject to generally the same tax laws and treaty considerations as pertain to their present RST shares . . . while receiving the other assets being distributed to them free of Zambian exchange control restrictions; and to the extent RST shareholders obtain AMAX common stock by exercising the AMAX Warrants being distributed, they will secure through AMAX an interest in such portion of RCM as AMAX may then own.

The court found this statement misleading because of its implication that the shareholders by adopting amalgamation would receive the maximum interest allowable in the RCM shares and other assets.

On analysis it becomes clear that as to the RCM shares the shareholders did in fact receive the maximum interest it was permissible to distribute. Had there been no amalgamation with AMAX, it is not true that RST shareholders could have obtained a higher percentage of RCM stock. Under the Agreement with Zambia, 51% of the RCM stock was owned by Zambia and 12¼% belonged to the Anglo-American Corporation Group which owned a minority interest in several RST subsidiaries.

The remaining 36¾% was to be divided between AMAX and the other RST shareholders. However, under the terms of the Zambian Agreement, the holder of the management contract had to retain a 20% interest in RCM. Thus, only 16¾% remained available for distribution to the RST shareholders and they received this percentage pursuant to the amalgamation proposal. The disproportionate amount of RCM shares received by AMAX was due to the 20% clause in the Zambian nationalization agreement and not due to the amalgamation. Breach of the 20% clause would have precipitated forfeiture of the management contract and eventuated an unfortunate loss of a potentially profitable asset. We conclude that the Explanatory Statement was not misleading as to the proportion of RCM stock available for distribution to the non-AMAX shareholders of RST and hold that the district court's finding to the contrary was clearly erroneous.

The court below also found that the presentation of the proposal concealed the fact that "if there were no amalgamation . . . the stockholders of RST would have been entitled to their own pro rata interest in all of the assets acquired by AMAX, including the disproportionate interest in . . . the management contract, the Ametalco group, and their interest in the miscellaneous assets." The Statement does not refer to other assets split disproportionately between AMAX and the other RST shareholders, however. Rather, it refers generically to "mining operations." The management contract, the Ametalco group, and the miscellaneous assets, specified by the district court as misleadingly treated in this part of the Explanatory Statement, were not actually "mining operations." We therefore conclude, contrary to the district court, that the quoted excerpt from the Statement accurately described the situation with respect to the RCM shares and that no improper implication existed concerning the other assets pointed to by the court below.

## I. CONFLICTS OF INTEREST OF RST DIRECTORS AND BANKING ADVISERS

The district court found that the interests of individual RST directors in the amalgamation proposal were insufficiently disclosed in the proxy materials. While we recognize the necessity for shareholders to be informed of the extensive conflicts of interest here present, we cannot agree with the district court's conclusion that such were not adequately disclosed.

Directly after the paragraph of the Explanatory Statement which sets forth the recommendation of the RST Board this heading appears in boldfaced type: "6. Interests of Directors, Advising Bankers and Others." The text of this section and the parts of the Statement Appendices referred to therein fully document all the relevant conflicts of interest. We think this presentation satisfied the equal prominence rule.

The recommendation of the RST Board also is in boldfaced type. Appearing in Item 5 of the Statement, it urges shareholders to approve the proposal. The third paragraph of Item 5 states that, *except* for six directors who abstained from voting due to their positions with AMAX, the RST Board was unanimous in its approval of the amalgamation proposal. The paragraph immediately following then states that Item 6 and Appendix O describe the "interests in the proposal of directors of RST and others and provide information concerning the directors of RST who are also directors or officers of AMAX or its largest shareholder, Selection Trust Limited. . . ." Item 6 initially refers the reader to Appendix O. It then proceeds to disclose AMAX's 42.3% ownership of RST and the interrelationship between AMAX and RST resulting from the fact that certain named individuals were officers and/or directors of both companies. Item 6 also sets forth the shareholdings of various individuals in AMAX and RST. Appendix O contains comprehensive information about the interrelationship of RST directors with AMAX and Selection Trust Limited. It also lists the shareholdings of these individuals in AMAX and RST.

The fact, relied upon by the district court, that the RST Board recommendation appears in boldfaced type whereas only part of the disclosures of conflicting interests so appears does not in our view, violate the equal prominence rule. Nor is the rule violated because some of the interest disclosures were made only in the Appendices. Reasonable latitude in this area is important if nit-picking is not to become the name of the game.

The district court considered it particularly important that the identities of the four participants in the AMAX-RST negotiations be disclosed. Prain and Vuillequez, RST officers, were negotiators for RST and were also interested in AMAX either as directors or through stock ownership. Donahue and Mac-Gregor, AMAX officers, were negotiators for AMAX. They also were directors of RST. Undeniably, disclosure of these dual loyalties might have dramatized more clearly the conflicts of interest existing here. However, considering the Explanatory Statement in its entirety, we think the district court's finding on this point exacts undue disclosure in this particular case. The exhaustive explication of RST directors' conflicts of interest sufficed to alert the shareholders of possible bias affecting the AMAX–RST negotiations.

The district court also found that the possible allegiances of N. M. Rothschild & Sons with AMAX and RST were insufficiently disclosed. The firm was the financial adviser of RST during the amalgamation discussions. Its opinion approving the final proposal appears boldfaced at the outset of the Explanatory Statement. Item 6 of the Statement notes that Rothschild had performed sundry services for AMAX in earlier transactions and that the consideration paid had approximated $46,000. The reader also is referred to Appendix O where the Rothschild shareholdings are disclosed. It is revealed that the firm held almost

53,000 shares of RST stock and none of AMAX. We think these disclosures adequately document the Rothschild firm's interests in AMAX and RST and conclude that the district court's finding to the contrary was clearly erroneous.

## J. FAILURE TO DISCLOSE THAT RST'S BANKING ADVISERS DID NOT MAKE AN INDEPENDENT SURVEY OF RST'S ASSETS

 The district court found that insufficient emphasis was given by the proxy materials to the fact that the endorsement of RST's investment advisers was not based on an independent survey of the assets and operations of RST. The bankers' approval of the proposed amalgamation relied solely on data supplied by the RST management. This fact is disclosed in Appendix Q. However, no reference is made to this appendicized disclosure at the outset of the Explanatory Statement where the investment advisers' approval of the amalgamation proposal appears. Considering that disclosure of the basis for the advisers' recommendation was of signal importance, we find no error in district court's conclusion that the failure to direct the readers to the disclosures made in Appendix Q constituted a material omission violative of Rule 10b–5.

## K. THE FAILURE TO DISCLOSE THE ROLE OF THE LAW FIRM, SULLIVAN & CROMWELL

Sullivan & Cromwell is a New York law firm which the district court found had "placed itself in a clear position of conflict of interest" by "advis[ing] RST in its negotiations with the Zambian Government and continu[ing] to represent both AMAX and RST even after the amalgamation was proposed." 322 F.Supp. 1362. The firm had represented both RST and AMAX for over thirty-five years preceding this litigation. The court felt that it was a material omission from the proxy statement not to disclose the capacity in which the firm acted during the nationalization and amalgamation negotiations. As ex-

pressed in the district court's opinion, "[i]t would be important for shareholders, in evaluating the advice of RST directors to vote in favor of the amalgamation, to know that through December, 1969 RST was being advised by lawyers who were also advising AMAX" *Id.*

 We do not think the record supports the court's finding that Sullivan & Cromwell's activities created a conflict of interest which the defendants were obligated to disclose. Defendants admit that representation by Sullivan & Cromwell of both AMAX and RST continued until late December, 1969. They admit also that this was during the period when amalgamation with AMAX was a possible alternative under consideration by the RST management. Defendants contend, however, that at no time during this period were the interests of AMAX opposed to those of the other RST shareholders. Rather, the conflict first arose when AMAX and RST commenced to negotiate amalgamation of RST with AMAX as a means of externalization. Defendants say that when this occurred Sullivan & Cromwell immediately advised RST that it could not represent it in such negotiations and that, pursuant to Sullivan & Cromwell's recommendation, RST retained new counsel for purposes of the amalgamation bargaining. In fact the district court found that from the outset of the RST–AMAX negotiations RST was represented by the New York firm of Winthrop, Stimson, Putnam & Roberts, as well as by English counsel.

From a review of the record we find that three dates emerge as pivotal in analyzing the district court's conclusion that a conflict of interest existed as to Sullivan & Cromwell's representation. The first is December 11, 1969, the date on which MacGregor on behalf of AMAX proposed amalgamation to RST. Next is December 22, 1969, when the RST Board gave final approval to the Zambian-RST Agreement. Finally, there is January 9, 1970, the date of the first amalgamation negotiating session between RST and AMAX.

No evidence in the record permits an inference that after December 22, 1969, when the Zambian negotiations had ended, Sullivan & Cromwell advised RST to any extent concerning alternative means of externalization. Thus, the only period which need be considered is that from December 11, 1969, through December 22, 1969. During this time the Zambian negotiations still were not concluded. Consequently, the interests of RST and AMAX in these negotiations properly could be represented jointly by one counsel without any suggestion of a conflict of interest. Nothing in the record demonstrates that during this time Sullivan & Cromwell attempted dual representation of AMAX and RST concerning the amalgamation proposal. We do not consider the firm's efforts to advise RST generally concerning the several alternatives for externalization then being discussed as evidencing such a conflict.

We therefore conclude that the district court's finding that there was a material omission arising from the failure of the proxy materials to disclose the role of Sullivan & Cromwell was based on a clearly erroneous factual premise that the firm was in a conflict of interest position with respect to the negotiation of the terms of the amalgamation.

## CONCLUSION

We have affirmed several findings of the district court that the proxy material violated 10b–5. It is equally clear that the district court found that such misrepresentations were material. We agree because we are satisfied that the proxy violations related to subject matter "[which] might have been considered important by a reasonable shareholder who was in the process of deciding how to vote." Mills v. Electric Auto-Lite, 396 U.S. 375, 384, 90 S.Ct. 616, 621, 24 L.Ed.2d 593 (1970). Although Mills involved section 14, we are satisfied that the quoted materiality test is equally applicable to an alleged 10b–5 violation. Finally, we do not believe it is a defense to a finding of material violations of 10b–5 to say that some stockholders "discovered" the misrepresentations before the vote and thus were not misled, and therefore, since they were the class representatives, the entire class is precluded from obtaining any remedy. Compare Crane Co. v. Westinghouse, 419 F.2d 787, 797 (2nd Cir. 1969). We think those alleging a violation of Rule 10b–5 have an obligation to show a fraudulent and material misrepresentation and that, to the extent a reliance factor is required, in the present context it is encompassed by the finding that the misrepresentation was material.

We come finally to a consideration of defendants' attack on the remedy granted by the district court. By one of its supplementary orders entered in January 1971 the district court determined that those minority stockholders who elected to take under the terms of the amalgamation were also entitled to damages to compensate them for the loss resulting from the undervaluation of certain assets involved. Defendants insist that the district court was foreclosed by the Zambian decree from inquiring into the fairness of the amalgamation.

It is not entirely clear whether the district court's finding of unfairness was based on a finding of a violation of Rule 10b–5 or of some other corporate fiduciary law. Insofar as the Rule violations are concerned we are convinced that the district court was not free to ignore the Zambian decree. The decree involved the conduct of a Zambian corporation. It was entered by judicial action pursuant to statutory authority after a hearing on due notice. In these circumstances the district court could not look behind the decree even at the behest of American security holders. Canada Southern Ry. v. Gebhard, 109 U.S. 527, 3 S.Ct. 363, 27 L.Ed. 1020 (1883). If the district court's finding of unfairness can be said, doubtfully, to be based on some state corporate fiduciary law we think the same basic considerations we have mentioned require that comity be afforded the Zambian decree.

Consequently, we conclude that the district court was in error to the extent it determined that damages should be awarded on the basis of its finding that the amalgamation was unfair.

Our consideration of the effect to be given the Zambian decree does not end the matter. We say this because the district court found and we have affirmed its findings as to several material violations of Rule 10b–5. Those findings do not relate to the terms of the merger and thus do not impinge upon our ruling giving effect to the fairness finding of the Zambian decree. Rather the findings go to the adequacy of the disclosure. Thus, they may have influenced the stockholder vote regardless of the fairness of the amalgamation. In these circumstances we think the court is obligated to provide a remedy. Otherwise the Congressional policy implicit in federal securities regulation in this country would be seriously frustrated. Mills v. Electric Auto-Lite, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed. 593 (1970).

 The district court ordered that defendants should offer plaintiffs' class the right to exchange what they received for a proportionate interest in RST International. The district court reasoned that since rescission was not feasible the most appropriate and equitable way to implement the finding of a violation of Rule 10b–5 was to grant the minority stockholders of RST equity participation in RST International, the receptacle for most of the assets of RST Limited. We think this exchange was a reasonable means of remedying the proxy rule violations in a case where rescission was not practical.

The plaintiffs argued to the district court that the exchange offer remedy would subject those accepting it to a loss of Zambian tax credits to which they were entitled on their old holdings. The court ordered supplementary hearings to determine the legality and feasability of a so-called twinning plan, presumably designed to give them securities which might avoid the loss of the tax credit. It ordered further hearings to determine, alternatively, whether monetary relief should be granted for the loss of the tax credit by those accepting the exchange offer.

Even on this record we think the twinning proposal is so far removed from business reality that its approval could not withstand review. We therefore reverse the order of the district court to the extent it directs further proceedings as to its feasibility. Nor do we think the district court was free to grant damages for loss of the Zambian tax credit to the members of plaintiffs' class who elected to accept defendants' exchange offer. We say this because the impetus for the reorganization was the desire to externalize assets. Given this pervasive business reason, it is evident that once twinning is determined inappropriate there could be no retention of the tax credit. It was therefore not a proper element of damage even by way of implementing the exchange offer.

We conclude that it was error for the district court to order further proceedings on these matters.

Since we have concluded that the district court was not warranted in ordering additional proceedings looking to the possibility of granting further relief to the class, it is unnecessary for us to reach defendants' argument that the district court's action in ordering further hearings violated the stipulation that a jury trial was waived on the condition that there be a "single unitary final hearing."

Appeals Nos. 19,175 and 19,176 will be dismissed as moot. The orders from which the other four appeals were taken (Nos. 19,537, 71–1099, 19,538, 71–1100) will be affirmed as modified in this opinion. In view of our disposition of defendants' appeals, plaintiff's appeal (No. 71–1101) will be dismissed.

ADAMS, Circuit Judge (concurring and dissenting).

Although I concur in much of the majority opinion in this case. I disagree

with the conclusion that what transpired here is the sort of conduct that Congress intended to proscribe by the Securities Exchange Act of 1934. I agree with the majority's treatment of the effect of the Zambian decree and the further hearing on remedy ordered by the district court despite the stipulation approved by the court providing for "a single unitary final hearing," but because of the importance of this case and of these issues, I feel constrained to set forth my views on these matters. In addition, the remedy authorized by the majority merits in my view further comment.

The majority opinion states fraud is an essential element of a cause of action under Section 10(b) and Rule 10b–5. It then goes on to assert that the district court found that the "Explanatory Statement and Appendices sent to RST shareholders was deliberately misleading and thereby violated Section 10(b) of the Securities and Exchange Act as well as Rule 10b–5", and that fraud was found because these documents "were designed to create the false impression that the amalgamation, on the basis of the terms specified by the explanatory materials, was an inevitable consequence of Zambian nationalization." Finally, the majority holds that the element of reliance, to the extent it is required, is satisfied by "the finding that the misrepresentation was material."

The crucial basis of this dissent is that the statements were not misrepresentations, that if they deviated from the truth, the misrepresentations were not material, that the plaintiff class did not rely on the misrepresentations, and that the conclusory statements by the district court do not constitute findings of fraud, and to the extent they might, such findings are clearly erroneous in light of the applicable legal standards and the lack of factual support for them in the record.

In short, without a finding of culpable conduct supported by the record, there can be no violation of the securities laws and regulations, and the imposition of liability is therefore not legally authorized.

## I. THE BACKGROUND OF THE CONTROVERSY

In order to gain the full perspective of this case, it is necessary to explore in some further detail the factual setting, beginning a number of years prior to the events which culminated in this lawsuit.

Rhodesian Selection Trust (RST), a British company, began mining operations in Northern Rhodesia in 1927. It was reincorporated as a Northern Rhodesian company in 1953. Over the years RST became one of the two major producers of refined copper in the area. In 1961, Rhodesia imposed currency exchange control regulations which greatly restricted RST from seeking and exploiting foreign opportunities except in Botswanna, a neighboring country.[1]

Throughout the 1960's the political situation in Africa became increasingly tumultuous. In 1964, the Rhodesian Federation was dissolved, and Northern Rhodesia became the Republic of Zambia.[2] This Government, by the Mulinguishi Declaration of 1968, further circumscribed RST's business mobility by limiting the dividends which could be paid to shareholders outside Zambia to 50% of accrued profits.

RST's largest shareholder was American Metal Climax, Inc. (AMAX), a large American mining company. From 1933 to 1962, AMAX held 51% of RST's stock, but by 1969, its holdings had decreased to 42.3%. Although AMAX held approximately 42% of RST's stock, and was represented on RST's board of directors, RST maintained its business in-

---

1. Because of the currency restrictions, RST was forced to terminate its explorations in Chile and Australia, two countries with vast mineral resources. The Fiji project, which was begun in May, 1969, was fund-

ed by non-Zambian earnings of Ametalco, RST's sales subsidiary.

2. After the Zambian government was created, RST changed its name to Roan Selection Trust.

dependence. The record in this case demonstrates that despite the substantial ownership of RST by AMAX, control of RST was vested in RST's management, and not in AMAX. RST's management was almost entirely British, and its headquarters was located in Zambia. By 1969, AMAX's investment in RST was worth approximately $100,000,000.

Because of the political ferment in Africa, AMAX decided as a matter of policy to decrease its exposure on that continent. In 1966, AMAX asked RST to file a registration statement with the SEC so that AMAX could sell its RST holdings on the open market. RST declined for two reasons: it was reluctant to incur the risks of registration for the primary benefit of one shareholder, and the necessary disclosures would have jeopardized its position with the Zambian government.[3] Thereafter, AMAX began selling its RST stock to the limited extent permissible under the American securities laws.

Still desiring to get out of Africa, AMAX in 1968 and 1969 attempted to sell half of its interest in RST to Megallgesellschaft Aktiengesellschaft, a large German metals company, for $5.-38 per share. At the time, RST was selling on the open market for between 5⅜ and 7⅛ per share. However, the German company was not willing to pay more than $3.00 per share, and even this offer was conditioned upon insurance by the West German government against the risks of nationalization by Zambia. The sale was never consummated.

Despite public and private assurances that Zambia had no intention of nationalizing the copper industry, the Government steadily acquired a number of the country's industrial and commercial companies. Then, in 1969, by the Matero Declaration, the President of Zambia announced his Government's desire to acquire control of all the operating copper properties in Zambia for "fair value represented by book value."[4] It immediately became clear that the Zambian Government was desirous of having this nationalization appear to be voluntary. Thus, the management of RST was able to negotiate and to extract, in addition to the sale price for 51% of RST's operating assets, two important concessions as the quid pro quo for the appearance of voluntariness: the authorization for RST to externalize its remaining assets so that they would be free from Zambian exchange controls,[5] and the right to defer nationalization until its terms were approved by the RST shareholders. This last provision provided time in which RST could arrange to implement the externalization of its assets. Externalization was of vital importance for tax reasons and because the Zambian dividend ceiling and exchange controls meant that large sums would otherwise have to be retained in Zambia and would not therefore be utilized to develop non-Zambian mining enterprises.

After the agreement with Zambia was reached, RST began to formulate its reorganization plan, keeping in mind that it would be imperative to external-

3. This strongly indicates that AMAX did not have control over RST in the sense that it could force RST to act against its best interests.

4. This value was to be paid in 6% bonds, guaranteed by the Zambian Government, in the face amount of the book value. These bonds traded at 45% of par (although on December 24, 1970, their value was $58.60). Thus, RST received from the Zambian Government only about 50% of book value for its assets that were nationalized.

5. A substantial portion of RST's assets that would remain after nationalization consisted of cash, representing funds which could not be distributed previously as a result of the Zambian foreign dividends' ceiling. Because of the practicalities of shareholder relationships, RST felt compelled to distribute some of this money to its shareholders. It was also advantageous to distribute the bonds which would be given in payment for the interest being nationalized to provide the greater political security of a widely dispersed group of bondholders who would be affected by any default by the Zambian Government. The other major copper producer in Zambia, Anglo-American Copper Co., followed a similar course of action after its nationalization.

ize as promptly as possible after nationalization. Concern immediately developed whether a conflict of interest and possible antitrust law violations would result if RST attempted to become an international mining company. These problems might arise because RST would then be competing against AMAX, although AMAX would still hold 42% of RST. The only feasible methods of avoiding this conflict were for AMAX to sell its RST holdings or to buy the remainder of RST after the distribution of RST's other assets.

AMAX had no desire to contravene its policy of disengagement from Africa in view of the political instability there, and yet it had to protect its $100,000,-000 investment in RST. Although RST wished to transform itself into an international mining company, because of the restrictions of prior years, this course of action was not feasible.[6] In order for RST to buy out AMAX's holdings to avoid the conflict of having AMAX in effect compete against itself, RST would have to denude itself of cash. In addition, a "bail-out" by AMAX at this time would have undermined the confidence of investors and personnel in RST's stability, and would have shifted to RST shareholders the full risk of further nationalization. This would also seriously depreciate further the value of the substantial amount of INDECO bonds to be owned by AMAX as a result of Zambia's nationalization.

Accordingly, RST and AMAX began to negotiate the various alternatives for RST's future. The discussions commenced in November, 1969, in London, between RST's and AMAX's banking and legal advisors.[7] There is nothing in the record to show that these discussions occurred at other than arm's length. By the middle of February, 1970, the parties were so far from agreement that AMAX proposed a complete pro rata liquidation of all RST assets not necessary for the performance of the contracts with the Zambian government. Under AMAX's recommendation, each shareholder, both AMAX and non-AMAX, would receive a proportionate share of RST's assets. Put another way, RST's liabilities would be discharged and every shareholder would receive his proportion of the remaining assets on the basis of his holdings in the company. RST's management rejected this proposal, because under it, RST would for all practical purposes cease to exist.

During this period, the concept of RST's becoming an international mining company, domiciled outside of Zambia, was explored further. Counsel quickly realized that such a reorganization would have disastrous tax consequences for the American-public shareholders of RST. The only solution to this problem, other than amalgamation [8] with AMAX,[9] was to "twin" the corporation. Under the twinning concept, RST would remain a Zambian corporation,

---

6. The currency restrictions had previously prevented RST from developing non-Zambian operating properties. Were RST now to become an international mining company, many non-productive years would be required to develop income-producing assets. Such development would also require the investment of large sums of money. This money, whether in the form of loans or stock investment would be difficult, if not impossible, to attract because RST would now have substantially reduced income as a result of losing its profitable copper mines. Also, such limited income would now be subjected to Zambian controls.

7. At this time, RST was advised by the highly reputable London solicitors, Fresh-

fields. Shortly thereafter, RST engaged N. M. Rothschild & Sons, an international merchant-banking firm, and Kuhn, Loeb & Co., a leading American investment banking firm. Winthrop, Stimson, Putnam & Roberts, later replaced by Cravath, Swaine & Moore, were retained as American counsel. The role of Sullivan & Cromwell is discussed by the majority, *ante* at 268. We agree with the majority that the findings of the trial court regarding the law firm of Sullivan & Cromwell were erroneous.

8. Amalgamation in Commonwealth countries is equivalent to merger in the United States.

9. Attempts to find another buyer of RST were fruitless.

holding some assets; a non-Zambian corporation would be formed to hold the externalized assets; and shareholders would receive "twinned" share certificates representing inseparable shareholders in both companies. "Twinning" was rejected as unrealistic for a variety of reasons, including, *inter alia*, the fear that Zambia would not tolerate the delay that implementation of this arrangement would cause.

By the end of February, 1970, RST's management concluded that the best interests of RST's shareholders lay in an amalgamation with AMAX. Two factors provided the incentives for AMAX's agreement to amalgamate. First, AMAX wanted to obtain liquid assets that RST owned because such assets would be exempt from American foreign investment restrictions. Second, in order to protect its $100,000,000 investment in RST, AMAX had to guard against RST's failure to succeed as an independent international mining company, for if RST had difficulties, its assets, and therefore AMAX's holdings, would depreciate in value. Similarly, payment of the INDECO bonds—and AMAX would own in excess of $50,000,000 of them—depended upon the profitable operation of the mines and refineries in Zambia.

The amalgamation agreement reached between AMAX and RST on March 5, 1970, provided for AMAX's acquisition of the public shareholders' interest in RST's liquid assets, worth about $33,-800,000, and the entire interest in RST's residual properties. In return, the public shareholders of RST would receive $76,200,000 of 8% subordinated AMAX debentures with warrants attached for the purchase of AMAX common stock. RST's public shareholders would also receive slightly more than their pro rata share of the Zambian bonds, their pro rata share of RST's interest in the Botswana venture, slightly less than their pro rata share of RCM stock,[10] and 25¢ per share in cash.

On March 5, 1970, the date of the agreement between RST and AMAX, RST traded on the New York Stock Exchange at $6.25 per share. Kuhn, Loeb & Co. valued the package of securities which RST shareholders would receive as a result of the proposed amalgamation at $7.13 per share, AMAX valued it at $6.62 per share and plaintiff's witnesses valued the package at between $6.95 and $12.20 per share.[11]

The structure of the amalgamation was devised to preserve to the maximum extent possible the tax credit for RST's public shareholders and to permit capital gains tax treatment of the distribution.

It was at this point in the negotiations, specifically on March 10, 1970, that plaintiff, who had purchased 2,000 shares of RST less than two months earlier, on January 14, 1970, instituted his action to block the amalgamation. After an evidentiary hearing, the district court on June 8, 1970, denied a preliminary injunction motion without prejudice.[12]

10. Originally, the Agreement with Zambia provided that the holder of the RCM management contract had to own 24% of RCM. AMAX's pro rata share of RCM would have amounted to 16%. Later negotiations with Zambia reduced the amount of RCM which would have to be retained to only 20%. Thus AMAX was contractually required to hold an additional 4% of RCM beyond its pro rata share.

11. The average price of RST on the New York Stock Exchange was 6¾ in 1969, 4⅞ in 1968 and 4⅝ in 1967. During the second quarter of 1969, before Zambia announced nationalization and when copper prices were near their peak, RST briefly touched its all-time high of 9½. Nationalization was announced on August 11, 1969, and from then until March 5, 1970, when amalgamation with AMAX was announced, the stock traded in the range of 3⅞ to 6⅞.

12. In its opinion denying a preliminary injunction, the district court held that a class action was properly maintainable, and that the court had jurisdiction over RST and the other defendants. However, a serious question is presented as to the extent a court in the United States can adjudicate the rights of foreign stockholders residing in foreign countries, who

Because the hearing by the Zambian court regarding the acquisition by the Government of Zambia of the Zambian assets was scheduled for August, 1970, the time consumed by the injunction proceeding compressed drastically the period for preparation of the necessary, but highly complicated, proxy materials and the Explanatory Statement.[13] In late June, plaintiff moved to enjoin the distribution of the proxy materials which presented the nationalization and reorganization plans for shareholder approval, charging that the materials violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j (1964). After a hearing, the district court enjoined the distribution, but this Court held that the district court's action was void for failure to enter an order under Rule 65. On July 8, 1970, the district court again enjoined distribution of the proxy materials unless a letter from plaintiff was also included with them. Plaintiff, one of the nation's most knowledgeable lawyers, drafted a statement explaining the opposition to the transaction. The proxy materials and plaintiff's statement were then distributed, including a copy of the district court's opinion, findings and order of June 8, 1970.

The day before the shareholder vote on the nationalization and reorganization was to be held, August 5, 1970, plaintiff moved to enjoin the vote, charging that the proxy materials were false and misleading. After a telephonic conference call to the trial judge, who was then in Florida, initiated by plaintiff and objected to by defendants,[14] this motion was denied, and the resolution adopting

the terms of the reorganization and nationalization was approved by 85.5% of the shares present and voting. The non-AMAX shareholders then approved the resolution by an affirmative vote of 66.3%. They had been separately polled by RST's management to ensure that AMAX would not force the amalgamation upon unwilling shareholders.

According to Zambian law, which governs this reorganization because of RST's domicile in Zambia, the next procedure in the reorganization was to obtain the approval of the High Court of Zambia. Nine days prior to the date of the scheduled hearing, RST filed with the High Court all of the details of the plan, including the complete record in the district court. Plaintiff had been specifically informed on prior occasions, and as late as the August 5th conference call, of the date of the hearing, and advised of his right to attend and to object to the plan. He had also been informed that the decree of the Zambian court would be binding on all RST shareholders.

On August 12, 1970, plaintiff moved to enjoin the hearing, and an injunction was granted by the district court via another long-distance conference telephone call. This Court stayed the injunction provided that AMAX post a $10,000,000 bond and agree not to transfer any property subject to a final adjudication.

After a hearing on August 14, 1970, the High Court of Zambia approved the reorganization, finding it to be "fair to all RST shareholders," and on August 15th, the High Court's order was filed with the Zambian Registrar of Com-

bought stock in a foreign corporation on a foreign stock exchange, where the proxy statement did not violate the securities laws of the other foreign nations. To avoid infringement of the rights of these foreign shareholders who might have desired amalgamation with AMAX in preference to some other plan of externalization, the district court could have ordered that a new vote under conditions which would insure the fairness of the election, be taken on just that question, rather than

ordering more drastic relief which might in fact be contrary to the wishes of a majority of the shareholders.

13. The Explanatory Statement is the equivalent of the American proxy statement.

14. Rule 77(b) of the Federal Rules of Civil Procedure states: "[N]o hearing * * * shall be conducted outside the district without the consent of all parties affected thereby."

panies. Plaintiff did not attend the Zambian hearing, and no appeal was taken from the order of the High Court of Zambia.

Trial of the present action began on October 8, 1970, and concluded on November 3, 1970. After a jury was empanelled, at the suggestion of the court the parties agreed to waive jury trial if all issues would be "finally determined by [the district court] in a single unitary final hearing." The district court rendered a final judgment on November 25, 1970. Defendants appealed on December 2, 1970. The next day, plaintiff moved to amend and supplement the judgment. On January 8, 1971, this Court, over the objection of the defendants, remanded to the district court to rule on plaintiff's motion. The district court filed three amendatory orders. One directed that supplementary hearings on the question of additional relief be held. Another was entered without notice to defendants and a discussion regarding its formulation took place between plaintiff and the court without participation by the defendants. On January 16, 1971, plaintiff filed a notice of appeal from the original judgment and the amendatory orders.

With the facts of the controversy in mind, we now turn to a consideration of the applicable securities laws and regulations.

## II. SECTION 10(b) AND RULE 10b-5

In order properly to evaluate the facts set forth above, it is necessary to consider and then apply the appropriate legal standards. Although much has been written about this area of the law, further exploration might tend to dispel the murkiness surrounding the contours of an action based upon material misrepresentation. To be able intelligently to decide whether defendants here should respond in damages or be subject to injunctive relief, a complete understanding of the section and rule, their legislative and administrative histories, and their interpretation by the courts is essential.

A. The Provisions of the Act and Rule and Their Legislative and Administrative Histories.

Section 10(b) of the Securities Exchange Act of 1934 provides:

"Regulation of the Use of Manipulative and Deceptive Devices

Sec. 10. It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \* \* \*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

Pursuant to this statute, the Securities and Exchange Commission promulgated Rule 10b-5, which implements the statute. It states:

"Rule 10b-5. Employment of Manipulative and Deceptive Devices

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

The provisions of Section 10(b) and Rule 10b-5 are written in broad lan-

guage, and some maintain they are ambiguous regarding the specific conduct that Congress and the Commission intended to prohibit. Therefore, since reference to the statute and rule will not provide the legal measuring rod, it is appropriate to examine the legislative and administrative history to ascertain the intent of Congress and the Commission. In as much as various aspects of this history have been extensively developed in the literature and cases, the present discussion will narrowly focus on aspects of the history relating to this case.

The Securities Exchange Act of 1934 was an outgrowth of the stock market crash of 1929 and the speculative boom of 1933. The present Section 10(b) evolved from Section 9(c) of bills originally introduced by Senator Fletcher and Representative Rayburn.[15] The legislative history deals primarily with other aspects of the 1934 act and is not very enlightening as to the intent of Section 10(b).[16] The Senate Report [17] discusses generally the various abuses which necessitated the legislative action and the inadequacy of self-regulation by the stock exchanges. The Report then analyzes the component provisions of the statute, citing examples of the flagrant

conduct utilized by unscrupulous speculators,[18] but does not parse Section 10. However, the Report is replete with words and phrases indicating that the act was designed primarily to prohibit fraudulent activities. Nowhere does the Report imply that liability without culpability would attach for material misrepresentations.

Thomas G. Corcoran, one of the draftsmen, explained the purpose of section 9 (c) of the original bills as follows:

> "Subsection (c) says, 'Thou shall not devise any other cunning devices. * * * Of course, subsection (c) is a catch-all clause to prevent manipulative devices[.] * * * The Commission should have the authority to deal with new manipulative devices.' " [19]

Thus, while Professor Bromberg is probably accurate in describing Section 10(b) as a "catchall," [20] it seems quite clear that it was intended to be a "catchall" only for "any manipulative or deceptive device[s] or contrivance[s]." [21]

The administrative history of Rule 10b–5 is even more cryptic than the legislative history of Section 10(b). Although the act had been passed in 1934, it was not until eight years later that the rule was promulgated.[22] The new rule

---

15. S. 2693 and H.R. 7852, 73d Cong., 2d Sess. § 9(c) (1934). Those bills would have made it unlawful to utilize "any device or contrivance * * * in a way or manner which the commission may by its rules and regulations find detrimental to the public interest or to the proper protection of investors." Shortly after hearings on the House Bill were held, a new bill was introduced which modified the language to read " * * * any manipulative device or contrivance * *." S. 3420 and H.R. 8720, 73d Cong., 2d Sess. 9(c) (1934). Still a third bill, omitting reference to devices and contrivances, was introduced in the House by Congressman Rayburn. H.R. 9323, 73d Cong., 2d Sess. (1934). The final wording of the act was drawn from, but modified, a Senate amendment to this last House bill. See H.R.Rep.No.1838, 73d Cong., 2d Sess., 32–33 (1934).

16. See generally, A. Bromberg, Securities Law—Fraud—SEC Rule 10b–5 § 2.2 (1970).

17. S.Rep. 792, 73d Cong., 2d Sess. 5 (1934).

18. Among the practices to be outlawed or regulated were the use of pools, wash sales, matched orders, buy and sell orders by the same party, dissemination of false information by a tipper (particularly where the tipper has a financial interest and can benefit from reaction to the tip), pegging, stabilization, use of options, short selling, and insider speculations.

19. Hearings before House Comm. on Interstate and Foreign Commerce on H.R. 7852 and H.R. 8720, 73d Cong. 2d Sess. 115 (1934).

20. A. Bromberg, supra, § 2.2 (332).

21. This is the language of Rule 10b–5.

22. The rule was apparently a response to a complaint from the Regional Administrator in Boston that a corporation president was telling the shareholders that the corporation was doing badly and then buying their shares at depressed prices, when in

was enunciated on May 21, 1942, and the SEC explained:

"The Securities and Exchange Commission today announced the adoption of a rule prohibiting *fraud* by any person in connection with the purchase of securities. The previously existing rules against *fraud* in the purchase of securities applied only to brokers and dealers. The new rule closes a loophole in the protections against *fraud* administered by the Commission by prohibiting individuals or companies from buying securities if they engage in *fraud* in their purchase." Securities and Exchange Act Rel. No. 3230 (1942) (emphasis added).

At the end of the year, in its Annual Report, the Commission again commented that the purpose of the rule was to protect investors against fraud.[23]

Thus, the administrative history of Rule 10b-5 clearly points to one inescapable conclusion: that it was designed as a safeguard against fraud or other culpable conduct, and not as a general regulation of business affairs.

B. Elements of a Private Action Involving Money Damages or Injunctive Relief Under Section 10(b) and Rule 10(b)-5

The next inquiry in determining whether defendants' conduct should give rise to equitable or pecuniary relief under the Act and Rule 10b-5 is into the nature of the right of action and the elements which must be alleged and proved to sustain the action.

At the time Rule 10b-5 was promulgated the SEC had not considered its application to private litigation, but rather contemplated enforcement only by the Commission.[24] Nevertheless, within a few years, courts had decided that the rule and statute implied a right of enforcement by private individuals.

The first case to so hold was Kardon v. National Gypsum Co., 69 F.Supp. 512 (E. D.Pa. 1946). In that case, where fraud was specifically alleged, Judge Kirkpatrick analyzed the statute and rule, and concluded that they created a statutory tort. He then applied tort principles to determine whether the plaintiff was a member of the class of persons the statute was designed to protect, whether the damage suffered was of the nature the statute was enacted to prevent, and whether the harm inflicted resulted from a hazard the statute was intended to obviate.[25] Other courts followed the lead of *Kardon,* and assumed or held that a private right of action was implied either by the language of the section or by construction of the entire statutory scheme.[26] One court approached the problem by beginning with the proposition that Section 10(b) is criminal in nature, and that a private right of ac-

---

23. "During the fiscal year the Commission adopted Rule X–10B–5 as an additional protection to investors. The new rule prohibits *fraud* by any person in connection with the purchase of securities, while the previously existing rules against *fraud* in the purchase of securities applied only to brokers and dealers." 8 SEC Ann. Rep. 10 (1942). (emphasis added).

fact the corporation was doing exceptionally well. The SEC attorneys quickly drafted the rule, combining language from Section 10(b) and Section 17 of the 1933 Act, and presented it to the Commission that day. The Commission approved the rule with the comment: "Well, we are against fraud, aren't we?" For a full account, see Conference on Codification of the Federal Securities Law, 22 Bus. Law. 793, 922 (1967), *reprinted* at A. Bromberg § 2.2 (410).

24. A. Bromberg, § 2.2 (420).

25. Judge Kirkpatrick's analysis based on an implied right of action was approved by this court in McClure v. Borne Chemical Co., 292 F.2d 824 (3d Cir.), cert. denied, 368 U.S. 939, 82 S.Ct. 832, 7 L.Ed.2d 339 (1961).

26. *See e. g.,* Fischman v. Raytheon Mfg. Co., 188 F.2d 783 (2d Cir. 1951); Fratt v. Robinson, 203 F.2d 627 (9th Cir. 1953); Speed v. Transamerica Corp., 235 F.2d 369 (3d Cir. 1956); Errion v. Connell, 236 F.2d 447 (9th Cir. 1956); Estate Counseling Serv. Inc. v. Mountain State Sec. Corp., 282 F.2d 195 (5th Cir. 1960), cert. denied 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961); Texas Continental Life Ins. Co. v. Dunne, 307 F.2d 242 (6th Cir. 1962); Boone v. Baugh, 308 F.2d 711 (8th Cir. 1962).

tion was inferrable therefrom.[27] Whatever the rationale, the Supreme Court has now determined that a private right of action could be inferred from the 1934 Act and the rules promulgated thereunder.[28]

But it is obvious that Congress did not intend that every false, misleading or omitted fact would give rise to a cause of action. For example, it would be unrealistic to allow recovery for the omission of a trivial point. Accordingly, it must be assumed that the misrepresentation be of a matter material to the purchase or sale of the security. *See* Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed. 593 (1970).

The Second Circuit defined materiality for Section 10(b) purposes [29] in SEC v. Texas Gulf Sulphur Co.

> "As we stated in List v. Fashion Park, Inc., 340 F.2d 457, 462, 'The basic test of materiality * * * is whether a *reasonable* man would attach importance [to the fact misrepresented] * * * in determining his choice of action in the transaction in question. * * * *'" 401 F.2d 833, 849 (2d Cir. 1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

And in the context of a misleading proxy statement, the Supreme Court defined materiality as that which "might have been considered important by a reasona-

ble shareholder who was in the process of deciding how to vote." Mills v. Electric Auto-Lite Co., *supra,* at 384, 90 S. Ct. at 621 (1970). These two tests from *Texas Gulf* and *Mills* are almost identical, the difference arising primarily from their particular applications. They will be the benchmarks for determining materiality here.

1. Element of Fraud or Culpability in Private Action Under Section 10(b) and Rule 10b-5.

Reference to the legislative history makes clear the intent of Congress to provide a private action so long as it is within certain parameters, including specifically, the elements of fraud and reliance.

In the general analysis of the Securities Act of 1934, the Senate Report states:

> "In addition to the discretionary and elastic powers conferred on the administrative authority, *effective regulation must include* several clear statutory provisions reinforced by penal and *civil sanctions, aimed at those manipulative and deceptive practices which have been demonstrated to fulfill no useful function. These sanctions are found in sections 9, 10, and 16.*" S. Rep. 792, 73d Cong., 2d Sess. 6 (1934) (emphasis added).

---

27. Trussell v. United Underwriters Ltd., 228 F.Supp. 757 (D.Colo.1964).

28. *See* Sup't. of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971) ; J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L. Ed.2d 423 (1964).

Apparently Section 18 was intended to govern actions for damages based on material misrepresentations. It contains a statute of limitations, specifying that the plaintiff must have had no knowledge of the falsity and must have relied on the statement, and provides for the defenses of good faith and lack of knowledge of the falsehood. This section is not applicable to 10(b) actions, however, since it allows recovery only for statements made "in any application, report, or document filed pursuant to this title or any rule or regulation thereunder * * *", whereas neither

Section 10(b) nor Rule 10b–5 require that "any application, report, or document" be filed.

29. *See,* General Time Corp. v. Talley Industries, Inc., 403 F.2d 159, 162 (2d Cir. 1968), cert. denied, 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969), where for purposes of § 14(a) the test formulated for materiality was: "[w]hether, taking a properly realistic view, there is a substantial likelihood that the misstatement or omission may have led a stockholder to grant a proxy to the solicitor or to withhold one from the other side, whereas in the absence of this he would have taken a contrary course." *See also,* Fershtman v. Schectman, 450 F.2d 1357, 1360 (2d Cir. 1971) ; Review 71 v. Alloys Unlimited, Inc, 450 F.2d 482, 485 (10th Cir. 1971) ; Levine v. Seilon, 439 F.2d 328, 332 (2d Cir. 1971).

And in discussing civil liabilities, the Report explains:

"Experience with State laws designed to prevent the exploitation of the investor by supervision of the sale of securities has demonstrated the inadequacy of criminal penalties as the sole sanction. Customers are ordinarily reluctant to resort to criminal proceedings, and in the absence of complaints by them, the discovery of violations is often impossible. Furthermore, *if an investor has suffered loss by reason of illicit practices, it is equitable that he should be allowed to recover damages from the guilty party.* With these considerations in view, the bill provides that any person who unlawfully manipulates the price of a security, or who induces transaction in a security by means of false or misleading statements, or who makes a false or misleading statement in the report of a corporation, shall be liable in damages to those who have bought or sold the security at prices affected by such violation or statement. *In such case the burden is on the plaintiff* to show the violation or the fact that the statement was false or misleading, and *that he relied thereon to his damage. The defendant may escape liability by showing that the statement was made in good faith."* *Id.* at 12–13 (emphasis added).

Thus, it appears that Congress intended to grant a private action for damages suffered as a result of "illicit practices," consisting of "manipulative and deceptive practices which have been demonstrated to fulfill no usful function." Essential to the elements intended by Congress are the requirements that the defendant has acted in other than "good faith" and that the plaintiff has "relied"

on the misleading statement. Nowhere in the Senate Report is there a manifestation of an intent by Congress to provide a cause of action based on either mere negligence or liability without fault. There is no evidence that Congress intended that under Section 10(b) anyone should be an insurer against false or misleading statements made non-negligently or in good faith.

It seems clear from the discussion of the legislative history of Section 10(b) and the administrative history of Rule 10b-5 that Congress and the SEC both intended, before any liability for misrepresentation might attach, that the element of culpability be present. This intent was manifested by the constant usage of words such as "cunning," "manipulative," "deceptive," "fraudulent," "illicit," "fraud," and lack of "good faith," and the absence of language indicating liability for negligent or non-negligent conduct. The inquiry then becomes whether courts have construed the language of the statute and rule so as to obviate the requirement of culpability that Congress and the SEC apparently contemplated.

The issue of scienter, or the intent to defraud, in 10b-5 matters has been widely discussed in the literature and, as might be expected, a divergence of opinion exists. One commentator urges that mere negligence should ordinarily be sufficient to give rise to a cause of action, but recommends the adoption of a flexible, transactional approach.[30] Other articles insist that 10b-5 liability should not attach to mere negligence, but rather the test ought to be whether the defendant actually knew the statement in question was false or misleading, and that in any event good faith sufficient to negative the intent to mislead would be an adequate defense.[31]

---

[30]. Comment, Scienter in Private Damage Actions under Rule 10b-5, 57 Geo.L.J. 1108, 1116–1117 (1969). That conclusion is based on the reasoning that private damage actions are equivalent to SEC enforcement proceedings, citing J.I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), and scienter is no

longer required in SEC injunctive actions, citing SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

[31]. Comment, Scienter and Rule 10b-5, 69 Colum.L.Rev. 1057, 1080–1081 (1969).

The cases collected and summarized in the Appendix to this opinion indicate that the vast majority hold, on analysis, but without specifically so stating, that for a private party to recover damages the element of fraud or culpability must be present. A number of courts assert that some form of intent to defraud must be pleaded or proved before recovery may be had, but a number have eliminated intent to defraud as a necessary element.

The requirement of intent to defraud was first incorporated into securities case law in criminal prosecutions for mail fraud and for fraud in violation of Section 17 of the Securities Act of 1933. *See* Rice v. United States, 149 F.2d 601 (10th Cir. 1945); Troutman v. United States, 100 F.2d 628 (10th Cir. 1938). *See also,* United States v. Benjamin, 328 F.2d 854 (2d Cir.), cert. denied, 377 U.S. 953, 84 S.Ct. 1631, 12 L.Ed.2d 497 (1964). Since Rule 10b-5 was drafted on the basis of the language of Section 17, it follows logically that intent to defraud would also be an element of a criminal prosecution for violation of Section 10(b) and Rule 10b-5. *Cf.* Trussell v. United Underwriters, Ltd., 228 F.Supp. 757 (D.Colo. 1964).

Fischman v. Raytheon Mfg. Co., 188 F.2d 783 (2d Cir. 1951), one of the earliest decisions holding that a private action existed under 10b-5, is the seminal case establishing scienter, or the intent to defraud, as an essential requirement for the maintenance of such an action. *Fischman* involved a suit for damages arising from a purchase of stock where untrue representations had been made in a prospectus and registration statement. The Second Circuit laid down the rule that "[p]roof of fraud is required in suits under § 10(b) * * *." The court explained: "[W]hen, to conduct actionable under § 11 of the 1933 Act, there is added the ingredient of fraud,

then that conduct becomes actionable under § 10(b) * * *." Most cases decided subsequent to *Fischman* have not deviated from this position.

In Weber v. C. M. P. Corp., 242 F.Supp. 321 (S.D.N.Y. 1965), the court reasoned that to predicate relief on innocent or negligent misrepresentations would add a remedy not contemplated by Congress, as Section 10(b) would then render other sections of the securities acts meaningless. Mutual Shares Corp. v. Genesco, Inc., 384 F.2d 540 (2d Cir. 1967), held that an allegation of "[d]eceitful manipulation of the market price" by withholding dividends is sufficient to state a cause of action for injunctive relief.

In SEC v. Frank, 388 F.2d 486 (2d Cir. 1968), the Government sought to restrain an attorney from drafting documents which falsely or misleadingly described the properties of a new chemical product. In reversing the injunction on other grounds, the court indicated that an attorney would be liable for assisting in circulating a statement "he knows to be false," and that he cannot "escape liability for fraud by closing his eyes to what he saw and could readily understand." The case strongly suggests that the attorney would not be liable for errors resulting from mere negligence in translating technical reports into ordinary English, but that recklessness would be tantamount to wilful fraud, from which intent could be inferred.

Apparently the Fifth Circuit also requires the element of fraud. In Herpich v. Wallace, 430 F.2d 792 (5th Cir. 1970), the court held that allegations of a "broad scheme to defraud" are sufficient to sustain a cause of action, as are allegations of facts amounting to "causal deceit." *See also,* Shell v. Hensley, 430 F.2d 819, 824 (5th Cir. 1970) (allegations of fraudulent activity).

The author of this article suggests that the broad language in the cases eliminating scienter is due either to the incriminating facts of those cases or to judicial attempts to circumvent poor pleading on the part of plaintiffs. *Id.* at 1066. *See also,*

A. Bromberg, § 7.46(b), *supra;* W. Painter Federal Regulation of Insider Trading 246 (1968); Note, Proof of Scienter Necessary in a Private Suit under SEC Anti-Fraud Rule 10b-5, 63 Mich.L.Rev. 1070 (1963).

This Circuit, too, has adopted the view that fraud or deception is required to establish a violation of Rule 10b-5. In Pappas v. Moss, 393 F.2d 865 (3d Cir. 1968), we concluded that the threshold requirement of a 10b-5 action was met because "a fraud in the act of selling a security" had been asserted.

There is nothing in SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963), indicating that proof of fraud is an obsolete requirement. The Government there sought an injunction under the Investment Advisors Act of 1940, which contains language similar to that found in Section 10(b), to compel a registered investment advisor to disclose to its customers its practice of purchasing securities, recommending purchases of those securities by the subscribers to the service, and then selling the securities at a profit when the clients' subsequent purchases caused an increase in the price. The Supreme Court based its holding on the fiduciary relationship existing between an advisor and his client. In relying on modern common law formulations of fraud, the Court stated that it would defeat the intent of the Act "to require proof of intent to injure and actual injury to clients" in an injunction action.[32] Thus, *Capital Gains Research Bureau* can be read as expanding the scope of Section 10(b) by including in the requirement of fraud the concept of constructive fraud, but it in no way eliminates the requirement altogether.

There have been cases, however, which seem to indicate that intent to defraud need not be alleged or proved to prosecute successfully a private action under Section 10(b) and Rule 10b-5. In analyzing these cases which purport to dispense with intent, the admonishment of the Supreme Court that 10(b) actions constitute an "area where glib generalizations and unthinking abstractions are major occupational hazards"[33] must be kept firmly in mind.

The first case which some commentators cite for the proposition that intent to defraud, scienter or culpability is not essential to a cause of action based on material misrepresentations is Ellis v. Carter, 291 F.2d 270 (9th Cir. 1961). That case was a private action for damages resulting from defendant's misrepresentation that if plaintiff, as a participant in a joint venture to acquire control of a corporation, would purchase shares of the corporation at a price in excess of the market price, he would thereby obtain a voice in the corporate management. The Ninth Circuit held that a dismissal of a complaint may not be granted where the affidavits presented a disputed issue of fact as to the fraudulent nature of the conduct.[34]

The court stated that Congress intended liability if there existed "any manipulative or deceptive device or contrivance in contravention of rules and regulations." Quite significantly, there is no citation in *Ellis* to support the suggestion that fraud is not necessary in a 10b-5 action. *Ellis* relies primarily on Matheson v. Armbrust, 284 F.2d 670 (9th Cir. 1960), but *Matheson* does not say that fraud is unnecessary, and indeed there is in it a square finding of intentional fraud.

Royal Air Properties, Inc. v. Smith, 312 F.2d 210 (9th Cir. 1962), another Ninth Circuit case dealing with the subject, was a private action for damages arising out of the purchase of stock in a corporation engaged in erecting apartment buildings,

---

32. Mr. Justice Goldberg, writing for the majority significantly limited the holding to suits "for equitable or prophylactic relief."

33. SEC v. National Securities, Inc., 393 U.S. 453, 465, 89 S.Ct. 564, 571, 21 L.Ed. 2d 668 (1969).

34. "Reading together the amended complaint and the affidavits filed by appellant in the summary judgment proceeding, we find sufficient particulars stated with regard to the fraud averments to meet the requirements of rule 9(b). Any additional information appellees may desire concerning the circumstances relied upon to establish fraud may be sought in pretrial discovery proceedings. The judgment is reversed." 291 F.2d at 275–276.

The plaintiff alleged that his purchase was based on misleading statements made by a corporate officer and on a prospectus which omitted reference in the financial statements to certain land costs and debts of the corporation. In reviewing a judgment on the merits, the Court stated that in order to succeed, plaintiff need not allege or prove fraud. But, for support, the only two citations are *Ellis* and *Matheson*. Further, the statement regarding ordinary fraud is not completely controlling, since the case was also concerned with the validity of various equitable defenses. In addition, analysis of the facts in *Royal Air Properties* indicates that the defendants did have actual knowledge of the critical omissions regarding the debt owed to the former president of the corporation and the substantial balance due on the corporate mortgage.

Another case considering and seemingly rejecting the element of intent to defraud is Kohler v. Kohler Co., 319 F.2d 634 (7th Cir. 1963), a private damage action arising out of the sale of stock by a shareholder to the corporation. The plaintiff, a member of the family controlling a large close corporation but who took no part in the management, desired to sell his interest in order to buy stock in another corporation. He asked the company to buy his shares so he could complete the other transaction. A dispute arose whether the shares should be valued at $115 or $125 per share. The accountant engaged by the company to negotiate the sale presented financial statements indicating that the value of the shares should be $117, whereupon a compromise was reached at $120. Kohler later sued for the difference, claiming that the financial statements constituted misrepresentations, half truths and omissions due to the accountant's erroneous estimations of earnings of similar companies, and non-disclosure of substantial items of deductions and income which would have affected the profit and profit potential of the company. In affirming a dismissal, the Seventh Circuit held only that there was no breach of duty on the part of the accountant in failing to volunteer details regarding a pension plan or the accounting method of annuity funding, even though a different method, if adopted, would have increased the company's book value. However, the Court gratuitously stated that Section 10(b) was "meant to cover more than deliberately and dishonestly misrepresenting or omitting material facts which ordinarily are badges of fraud and deceit," relying principally on *Ellis*, 319 F.2d at 637.

Stevens v. Vowell, 343 F.2d 374 (10th Cir. 1965), is yet another example of a court aserting that it is not necessary to allege common law fraud to recover damages under Section 10(b), although the facts demonstrate a situation where outright manipulation, or, indeed, actual fraud did exist. Plaintiff, in *Stevens*, sued to recover the amount paid for the purchase of stock in a corporation created to exploit an invention for the return of arrows in an archery lane. The defendants had misrepresented the ownership of the invention, their intent to build archery lanes to exploit the invention, and their intent to share funds others had invested. Although the court indicates absolute liability for material misrepresentations, relying on *Matheson* and *Royal Air Properties*, nonetheless the underlying facts demonstrate conduct from which intent to defraud is readily inferrable. It is significant that the same year *Stevens* was decided, a district court in the Tenth Circuit considered that the court of appeals went farther than necessary in making reference to the question of fraud and refused to find liability absent scienter, Parker v. Baltimore Paint and Chemical Corp., 244 F.Supp. 267 (D.Colo. 1965), relying instead on Trussell v. United Underwriters, Ltd., 228 F.Supp. 757 (D.Colo. 1964). *See also* Review 71 v. Alloys Unlimited, Inc., 450 F.2d 482 (10th Cir. 1972).

Myzel v. Fields, 386 F.2d 718 (8th Cir. 1967), cert. denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968), was a private action for damages arising out of the sale of stock in a closed corporation

to the corporation. The evidence disclosed a flagrant scheme by corporate officers to purchase all the outstanding stock at depressed prices, without advising the stockholders of the dramatic turn in the company's prospects, or that it was the company rather than another shareholder—as the sellers were led to believe—that was buying the stock.[35] In reviewing a jury verdict for plaintiff, the court stated that proof of "knowledge of the falseness of the impression produced by the statements or omissions made" is not necessary under the statute.[36] In reaching its conclusion that intent to defraud was not an element of the cause of action, the court relied on Ellis v. Carter, supra, and the district court's opinion in SEC v. Texas Gulf Sulphur Co., 258 F.Supp. 262, 277 (S.D. N.Y.1966).[37] As shown above, Ellis stands on a questionable basis, and, as will be discussed below, it is doubtful whether Texas Gulf Sulphur can be extended beyond the context of an SEC enforcement action. Analysis of Myzel, therefore, demonstrates that it is weak authority for the proposition that fraud

is no longer an essential element of a 10(b) action.

The Second Circuit, in SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), had occasion to consider the question of scienter. That case involved a misleading press release concerning a discovery of mineral deposits—described as a "once in a lifetime strike"—coupled with intensive insider trading. The SEC brought an action to enjoin the corporation and individual defendants from continuing such activity. In considering scienter, the district court, despite Stevens, Royal Air Properties and Ellis, ruled that although the SEC need not establish common law fraud, it must establish that the "defendants engaged in a 'course of business' which operated as a 'fraud or deceit * * * in connection with the purchase or sale of any security,'" relying on SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963).[38] The court of appeals, however, took a more expansive view of the scienter requirement. With respect to

35. For a number of years the corporation, which was in the business of making and selling signs, struggled for sales, had a limited profit picture, and had a total lack of return to the stockholders. The stockholders expressed continued concern about the soundness of their investment, and even suggested a dissolution. In 1951, the deficit was $51,000 and sales $94,000. By 1953, the corporation had entered into a lucrative contract, earned $30,000, and in four months had equalled the sales of the highest previous year. No disclosure was made of these favorable developments. At this point, Myzel, acting for the president, proceeded to purchase plaintiffs' outstanding stock. In doing so, he stated that the stock was worthless, the company was making no money, he had sold his own stock, the company was going to go bankrupt, the company was in a very difficult condition, he got nothing from the company, and things did not look any better for the future. Actually, the sales had increased to more than $2,000,000 in 1957, the officers were fully aware of the sales picture and prospects, in 1958 profits were $65,000 after taxes, substantial sums were paid to the Myzels for reasons shrouded in contraditions by the defendants, and all the stock was eventually transferred to the corporation.

36. The court then held that a jury instruction requiring a finding that the defendants had the "intent" of inducing plaintiffs to sell their stock" before imposing liability did not prejudice the defendants, as the instruction was more demanding than the statute required.

37. The court also relied on a quotation from Dale v. Rosenfeld, 229 F.2d 855, 858 (2d Cir. 1956), to the effect that willingness to disclose is not equivalent to disclosure. Dale, however, was an action under Section 12 of the Securities Act of 1933, which imposes absolute liability for misrepresentations contained in a prospectus or registration statement. Thus, Dale is clearly not applicable to a 10b-5 action, and Myzel's reliance on Dale is misplaced.

38. 258 F.Supp. 262, 277–278 (S.D.N.Y. 1966).

the individual defendants, Judge Waterman stated that "lack of diligence, constructive fraud, or unreasonable or negligent conduct" would be an appropriate standard to promote "the deterrence objective of the Rule." 401 F.2d at 855. Good faith would not constitute a defense unless the belief were reasonably held. *Id.*, at 856. With regard to the corporate defendant, Judge Waterman asserted that "in an action for injunctive relief, the district court has the discretionary power under Rule 10b-5 and Section 10(b) to issue an injunction, if the misleading statement resulted from a lack of due diligence \* \* \*." *Id.* at 863. The holding was restricted in both situations solely to injunctive actions.

However, only four judges joined in the view of scienter expressed by the main opinion.[39] Judge Friendly, whose vote was necessary to give Judge Waterman's opinion majority status, differed sharply on the question of intent. In delicately delineating the types of actions and the requisite intent to sustain each, he said that the holding of the main opinion should not be extended beyond an injunction action brought by the SEC.[40] As to private damage actions, Judge Friendly would limit the expansive liability holdings of other circuits in private 10(b) actions to "the kind of recklessness that is equivalent to wilful fraud." *Id.* at 868.[41] Accordingly, an analysis of *Texas Gulf Sulphur* demonstrates that its less stringent requirements should be applicable only in cases involving injunctive suits brought by the SEC.

Furthermore, subsequent private damage actions brought under Section 10(b) and reviewed by the Second Circuit indicate that it is not yet ready to apply the statements regarding the elements of fraud of *Texas Gulf Sulphur* beyond the setting of that case. In Heit v. Weitzen, 402 F.2d 909 (2d Cir. 1968), a damage action arising from the purchase of debentures where financial statements failed to disclose that income resulted from overcharges to the Government, the court held that the allegation that the defendants "knew or should have known that \* \* \* [the financial statements] were incorrect and false and misleading" would state a cause of action, since allegations of actual knowledge of falsity would be sufficient. And in Globus v. Law Research, Inc., 418 F. 2d 1276 (2d Cir. 1969), cert. denied, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970), an action for damages alleging that an underwriter's circular contained material omissions, the court approved an instruction requiring the jury, before ascertaining liability, to find actual knowledge of the falsity or, if the omission were disclosed, that the statement was misleading. The jury instruction in *Globus* was held not to be error since the allegations accused the defendants of actual knowledge, the evidence supported the allegations, and the jury found "high moral culpability." [42] In Drachman v. Harvey, 453 F.2d 722 (2d Cir. 1972) (en banc), the court, reversing the affirmance of the dismissal of a complaint, held that a "sufficient claim is stated of fraud. . . ." *Id.* at 737 (emphasis added). *See also* Movielab, Inc. v. Berk-

---

39. They were Judges Waterman, Smith, Hays and Feinberg (concurring). Judges Moore and Lumbard dissented.

40. Judges Kaufman and Anderson concurred separately, but indicated that they agreed with Judge Friendly's discussion of scienter and its application to SEC actions as distinguished from private damage actions.

41. Indeed, Judge Friendly expressed concern that even as limited, "Rule 10b-5 (2), absent the reading in of a *scienter*

requirement, goes beyond the authority granted by § 10(b) of the 1934 Act."

42. Judge Mansfield, the trial judge, stated that there was ample evidence to support punitive damages because the defendants "had acted fraudulently, wantonly and with reckless disregard for the consequences of their conduct and that they had committed a gross fraud, involving high moral culpability." 287 F.Supp. 188, 192 (S.D.N.Y.1968). However, the court of appeals held that there was no statutory basis for punitive damages.

ey Photo, Inc., 452 F.2d 662 (2d Cir. 1971); Fershtman v. Schectman, 450 F. 2d 1357, 1361 (2d Cir. 1971); Levine v. Seilon, 439 F.2d 328 (2d Cir. 1971).

Close examination of the cases discussing fraud reveals that the courts which on the surface appear to have drifted away from the intent of Congress, as explicitly expressed in the legislative and administrative history of the Act and Regulations, have not demonstrated sufficient justification for their language. Scrutiny of the facts in the cases demonstrates that the culpability contemplated by the Act was indeed present, frequently in flagrant form. Although the Supreme Court's opinion in *Capital Gains Research Bureau, supra,* indicates that in a suit to enjoin an ongoing course of action, "deliberate dishonesty" need not be shown, it nevertheless adopts a definition of fraud consistent with the Congressional intent. To go further would be impermissible, for in the language of a recent Supreme Court decision interpreting another section of the same Act, it would be a "construction [of the statute and rule] that not only strains, but flatly contradicts the words of the statute." Reliance Elec. Co. v. Emerson Elec. Co., 404 U.S. 418, 427, 92 S.Ct. 596, 601, 30 L.Ed.2d 575 (1972).[43]

A review of the cases reveals that the Seventh, Eighth, Ninth and Tenth Circuits have opted for broad coverage under the Act by purporting to eliminate the need for scienter, the Third and Fifth Circuits require a finding of culpability, while the Second Circuit is still unsettled as to the appropriate standard. However, determining the proper rule of law requires a closer analysis than merely polling the circuits or blindly following one of them. Instead, the cases should be carefully examined to glean their collective wisdom.

The first factor which becomes apparent is that in every case where liability was found, conduct tantamount to actual fraud existed, despite the fact that the reviewing court may have used language broader than necessary. In no case was liability affixed to non-culpable conduct, regardless of the dicta. *See* Kohler v. Kohler Co., *supra.* Thus, language must be peeled away to reach the core of the rationale behind the actions of the courts.

One distinction the cases suggest depends on the nature of the plaintiff. Where only one or a few parties are suing to recover, courts may well reach a different result from that when suit is brought on behalf of thousands of shareholders. Thus *Ellis, Royal Air Properties, Stevens,* and *Myzel* were essentially individual suits to recover personal damages. It is fitting that in the face-to-face confrontations, courts should impose a higher standard of disclosure by lessening the degree of culpability upon which liability can be imposed. From a practical standpoint, in such situations, the amount of damages is relatively finite, whereas in a suit on behalf of a class composed of thousands of shareholders, damages might well extend into millions of dollars. When faced with such huge potential payments, the brunt of which will be borne by innocent shareholders of the defendant corporation, the courts seem to have proceeded more slowly, by requiring that the plaintiff class prove conduct closer to the traditional concepts of actionable fraud.

Another distinction lies in the nature of the relief requested. Where the Government or a private party is seeking prospective injunctive relief only, it is appropriate that courts be able to protect the investors and shareholders from *future* harm even though the conduct involved does not amount to common

43. It is interesting to note that Justice Douglas stated, albeit in a different context, in Superintendent of Insurance v. Bankers Life & Casualty Co., *supra* at 404 U.S. 12, 92 S.Ct. at 169, 30 L.Ed.2d 128, "But we read § 10(b) to mean that Congress meant to bar *deceptive devices* and *contrivances* in the purchase or sale of securities whether conducted in the organized markets or face-to-face." (emphasis added).

law fraud. *See* SEC v. Capital Gains Research Bureau, Inc., *supra, cf.* SEC v. Texas Gulf Sulphur, *supra.* On the other hand, when the plaintiff class is seeking retrospective relief, such as substantial money damages or dissolution of a merger, more serious problems arise and a different balance must be struck. When the Act is utilized retrospectively rather than prophylactically, the courts must bear in mind that the civil recovery provisions were designed primarily as a "back-stop" for the criminal provisions, and that the Act operates essentially as a private penal statute. Where the relief discourages conduct through punishment, whether by damages or by divestiture, it is altogether proper, and indeed essential, for courts to cleave close to the Congressional purpose by construing the statute strictly, and to affix liability only where culpable conduct is made out.

Still a third variable is suggested by cases such as *Myzel* or *Mutual Shares Corp.* In the normal course of events, the ordinary shareholder has the right to rely on the fiduciary relationship between himself and his company to the extent of justifiably believing that recommendations with regard to shareholder action are in the best interests of the company. But where the management or board of directors of a corporation is either acting in their self interest, or for a controlling third party—a finding or conclusion not sustained by the majority opinion here—the shareholder is helpless unless he knows of the conflict of interest and has access to sufficient facts to reach a valid independent judgment. Hence, in self-dealing transactions, it does not seem unreasonable for courts, in an effort to achieve the required disclosure, to react by apparently lowering the standard of actionable conduct.

But it has now been established that this case does not involve self-dealing on the part of AMAX. Therefore, as a class action seeking retrospective relief of a punitive nature, every reason exists to apply the rigorous test of liability intended by Congress. Merely parroting selected words from the statute or rule should be inadequate to establish a base for liability without a finding of the required intent supported by the record.

In addition to the legislative and administrative history and the case by case analysis, the realities of the business world must be considered in formulating an appropriate rule of culpability for the operation of 10b–5. In the every day course of business, corporations are required to issue news releases, proxy statements, financial reports and myriad other documents, the subject matter of which are generally complex rather than simple. Full disclosure is essential in order to provide the public in general and investors in particular with adequate knowledge of corporate affairs. Because of the complexities of these documents, they will often contain some mistake or perhaps even misrepresentation. To predicate liability on mere error, or even negligence, where highly qualified law firms, accountants and investment brokers prepared the documents in good faith, would constitute corporations and their officers and directors insurers. If the courts were to impose liability on a corporation because the draftsmen of a proxy statement set forth a fact in a latter portion of the material rather than in a former portion, or included a particular provision in an appendix as distinguished from a footnote in the body of the text, the sought-after goal of a free flow of corporate information might be discouraged rather than encouraged. The pragmatic rule might well become, "when in doubt, say as little as possible."

On the other hand, if the placement of the data near the end of the document or in an appendix, or if the presentation of a proposition is in the form of one question rather than two, and there then is a finding that such arrangement is done with an intent to deceive, manipulate or defraud, the imposition of liability would accomplish the purposes of the Act and regulations, and not punish

the guileless or impede the stream of vital information.

In view of these considerations, and the fact that fraud or culpability appears to be the linchpin of Section 10 (b) and the regulation thereunder, it is critical that the elements of fraud *vel non* not be predicated on mere conclusory statements.

In summary, the proper standard of culpability to apply in a given case should take into account the intent of Congress and the SEC, the facts of the case as they bear on the conduct and interests of the parties, and the relationship of the defendants with those with whom they deal. It should balance the policies behind the statute and regulation against the facts of normal business life. To do otherwise would run the risk of deciding complicated matters, fraught with many subtle distinctions, by a process which amounts essentially to the mere application of labels.

### 2. The Element of Reliance in Private Actions Under the Securities Law.

At common law, a necessary element in recovery for the tort of deceit is "[j]ustifiable reliance upon the misrepresentation on the part of the plaintiff, in taking action or refraining from it." [44] Although both Section 10(b) and Rule 10b–5 are silent as to reliance, Congress clearly intended that as part of a plaintiff's case he prove that he relied on the particular misleading statement of which he complains. S.Rep. 792 at 13. And most cases discussing the matter hold that reliance is an essential element in an action for damages under the securities laws. *See* Rogen v. Ilikon Corp., 361 F.2d 260, 266–268 (1st Cir. 1966); Janigan v. Taylor, 344 F.2d 781, 785–786 (1st Cir.) cert. denied, 382 U. S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965); List v. Fashion Park, Inc., 348 F.2d 457, 463 (2d Cir.), cert. denied, 382

U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965).

Reliance is normally measured against the objective standard of the reasonable man. But in List v. Fashion Park, Inc., *supra*, the Second Circuit defined the test both objectively and subjectively:

"Thus, to the requirement that the *individual plaintiff* must have acted upon the fact misrepresented, is added the parallel requirement that a *reasonable man* would also have acted upon the fact misrepresented." 340 F.2d at 462 (footnote omitted).

In other words, did the plaintiff, and would a reasonable man, rely on the statement? This two-pronged test seems to apply equally well to cases where the misrepresentation was accomplished by non-disclosure as well as by affirmative statements.

With the advent of Rule 23, Fed.R. Civ.P. governing class actions, the question of reliance became more complicated, mainly because proof of reliance might vary as to each individual member of the class.[45] One court held that where there has been "a complete failure to disclose any material facts," a class action could be properly maintained. Esplin v. Hirschi, 402 F.2d 94 (10th Cir. 1968), cert. denied, 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1969). This solution, of course, avoided and therefore did not solve the more difficult problems presented by requiring proof of reliance in a class suit. Other courts have adopted various solutions considered workable. The Second Circuit approved separate trials to resolve the issue of reliance. Green v. Wolf, 406 F. 2d 291, 301 (2d Cir.), cert. denied, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1968). Another court employed the device of proof-of-claim forms which were sent to each member of the class. Korn v. Franchard Corp., CCH Fed.Sec.L.Rep. ¶ 92,616 (S.D.N.Y.1970).[46]

---

44. W. Prosser, Law of Torts (1964).

45. *See generally*, Note, The Impact of Class Actions on Rule 10b–5, 38 U.Chi.L.Rev. 337 (1971).

46. When only 80% of the class would not state "even in the most general terms what if anything was misstated", a "substantial number" said that they did not rely on the prospectus, many members of

Mader v. Armel, 402 F.2d 158, 161 (6th Cir. 1968), cert. denied, 394 U.S. 930, 89 S.Ct. 1188, 22 L.Ed.2d 459 (1969), in discussing the necessity for proving reliance with respect to a motion to dismiss the complaint, stated: "It seems to us that this is defensive matter hardly relevant to a motion to dismiss which admits the allegations of the complaint well pleaded." The *Mader* court relied on Vine v. Beneficial Financial Co., 374 F.2d 627 (2d Cir.), cert denied, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967), an individual private action, where the plaintiff was forced to exchange his shares as the result of a merger. The *Vine* court, also confronted with a motion to dismiss, stated (p. 635):

> "[W]e regard [reliance] as unnecessary in the limited instance when no volitional act is required and the result of a forced sale is exactly that intended by the wrongdoer."

Kahan v. Rosenstiel, 424 F.2d 161 (3d Cir.), cert. denied, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970), is an example of another situation where it was stated that "proof of reliance is not an independent element which must be alleged to establish a cause of action." *Id.* at 173. That case, however, must be read in light of its peculiar facts. There, plaintiff represented a class of shareholders who sued to enjoin an unfair merger. As a result of the suit, the defendants offered a more valuable package in return for the stock of the corporation to be acquired, and the matter was settled. Plaintiff then sued for expenses and attorney fees, and defendants moved for summary judgment on the basis that plaintiff had not stated a cause of action because the complaint had not alleged reliance by members of the class. The sole issue was whether summary judgment was appropriate. It was in this context that the Court, bear-

ing in mind the valuable services plaintiff had rendered to the class, viewed Mills v. Electric Auto-Lite Co., 396 U. S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), as obviating the need to *allege* reliance. This Court, in *Kahan*, had no occasion to address itself to the question whether reliance ultimately need be *proved* in a private 10b–5 action.

*Mills* was a class action under Section 14 and the proxy rules—provisions serving a different purpose from Section 10(b) and Rule 10b–5, and having substantially different standards. The thrust of the proxy rules is to ensure that shareholders receive accurate information by enabling objectors to a proxy statement to enjoin the distribution, or voting of proxies, or action taken pursuant to the vote, early in the process, while it is still relatively easy to correct the defect. Accordingly, it is appropriate that reliance and culpability not be essential independent elements of a Section 14 action. While the main thrust of Section 10(b) is to achieve the same goal, it does so by the significantly different method of prescribing penalties, civil and criminal, for the dissemination of false and misleading statements. In such case, reliance and culpability form crucial ingredients in the cause of action, and the equation in *Mills* of materiality with causation and reliance becomes inapplicable.

In any event, the critical omission in the *Mills* proxy statement was that substantially the same directors controlled Mergenthaler, the acquiring corporation that dominated Auto-Lite, the company to be acquired. As the majority opinion here indicates, such information was disclosed in great detail in the present case. *See ante*, at 267. The alleged misrepresentations here did not go to the independent judgment behind the directors' recommendations, as in *Mills*, but rather only to several segments of

the class admitted relying on the advice of other people, and only 7% refused to accept upon liquidation, payment of $4,570 per $5,000 invested, the court held that plaintiffs' interests were not typical

of the asserted class. The Second Circuit recently reversed this determination by the district court, but did not disapprove the use of such forms. CCH Fed.Sec.L. Rep. ¶ 93,397 (2d Cir. 1972).

the transaction. For example, one of the important points here involves the statements of the investment bankers that they had not *physically* appraised the Fiji and Baluba projects. The three investment banking firms made such statements, but did so in their opinion letters, which were included in the appendix to the Explanatory Statement rather than in the text. But the objection is not about the existence or non-existence of the *physical* aspects of these projects, but rather the method used to evaluate them.

Were *Mills* the latest word on the subject of reliance, one might contend that its broad language would be controlling, even in a 10(b) case. However, subsequent individual private damage cases indicate that the requirement of reliance still has vitality. *See* Gottlieb v. Sandia American Corporation, 452 F.2d 510, 516 (3d Cir. 1971); Chasins v. Smith Barney & Co., 438 F.2d 1167 (2d Cir. 1970) (test for reliance is causation in fact); City National Bank v. Vanderboom, 422 F.2d 221 (8th Cir. 1970) (reliance necessary in an individual's suit). Thus, the cases seem to fall into two categories: individual damage suits requiring proof of reliance, and class or injunctive actions not requiring proof of reliance beyond the objective standard. Since the present case was brought as a class action for pecuniary relief, at the very least the objective test must be met, and recovery may not be had if reasonable men would not have relied on the material in the Explanatory Statement about which a complaint has been asserted.

As noted in *Mills*, the objective test was primarily adopted to obviate the need to prove reliance on the part of each member of the class. But the *Mills* decision does not reach the important question raised by the unique facts present in this case. Here, unlike *Mills*, the class action and the fact that plain-

tiff adequately represented the interests of the class had been approved by the district court prior to the issuance of the alleged misstatements of which plaintiff complains. In this situation, are plaintiff and the class he represents nevertheless relieved of proving either subjective or objective reliance on the ground it can be presumed as a matter of law that they would not rely on material misrepresentations which they knew to be false? In other words, where the class *in fact* has *actual knowledge or notice* of an erroneous statement prior to the vote, because of the information possessed by its representative and the opportunity he had been given to communicate with the class at the expense of the company, is the class then estopped from asserting objective reliance? Apparently, this question has not been discussed either by the courts or commentators in Section 10(b) or Section 14 cases, and is therefore still unresolved. However, logic would dictate that the answer must be in the affirmative.

Another question not reached by *Mills* is also presented in this case. Where the class has been alerted to the misleading or false nature of the proxy statement by a letter written by its attorney and enclosed with the proxy statement, what duty is imposed upon reasonable shareholders to look for allegedly "buried facts" highlighted by that letter before it may be said, as a matter of law, that they relied on the non-effective disclosure of such facts? To pose this question would appear to answer it. Reasonable shareholders, when given notice by their attorney and representative that the proxy materials are erroneous or misleading, would at least read such materials closely, and if a careful review of the proxy statement and its appendices would reveal any buried facts, the shareholders should be precluded from asserting that they relied on the non-existence of such facts.[47] A differ-

---

47. The majority attempts to minimize the element of reliance by application of the principle that a defective proxy statement cannot be cured by reference to materials submitted to shareholders by other parties to a proxy fight. I have no quarrel with this rule as applied to cases brought under Section 14(a) to insure complete and accu-

ent result might be ordained where the allegedly "buried facts" were so artfully concealed that the ordinary shareholder could not discover them, or where they constitute an integral part of a manipulative scheme to defraud. However, there is no such finding here, nor even any suggestion that such conduct occurred.

### C. The Violations of Section 10(b) and Rule 10b–5 In Issue Here.

Having set forth the elements of a course of action under Section 10(b) and Rule 10b–5, we move to an examination of the specific conduct in this case on which liability is predicated.

It is important to understand that this is not a case of self-dealing on the part of AMAX, despite the inference which might arise from a 42% ownership of RST. First, the uncontradicted testimony was that RST was independent of AMAX and that RST and AMAX bargained at arms' length. Second, this testimony is underscored by the facts that RST refused to issue a registration statement for AMAX's benefit, and also refused to agree to a complete distribution of its assets, as suggested by AMAX. Thus, although it may appear that RST was in an inferior bargaining position, AMAX did not have such an unconscionable advantage, either through ownership or the exigent circumstances, so as to be able to make RST "dance on a string." Furthermore, as discussed by the majority, the interests of the officers and directors who negotiated the transaction were fully disclosed in great detail in the Explanatory Statement. Accordingly, analysis of the facts should not be approached from the standpoint of an "undisclosed self-dealing" suit, with its lower standard of scienter.

The majority has affirmed or declined to decide seven specific acts by defendants which were found by the district court to constitute violations of Section 10(b) and Rule 10b–5. These items fall into two broad categories: (1) those directly connected with the mechanics of nationalization, externalization and amalgamation, and (2) those concerning facts disclosed but allegedly "buried." For reasons more fully discussed below, I would hold that none of these acts constitutes a 10b–5 violation in the context of this case.

### 1. Charges Relating to Nationalization, Externalization and Amalgamation

The following particulars directly related to the nationalization, externalization and amalgamation of RST were held to be violations of Rule 10b–5: creating the false impression that the AMAX-RST amalgamation was a necessary consequence of nationalization; linking amalgamation and nationalization in a unitary proposal to the shareholders; and failing to disclose that externalization was discretionary and need not have been simultaneous with nationalization. In addition, the majority did not decide whether the district court was correct in ruling that the failure to disclose alternative plans for externalization and the implication that shareholder approval was prerequisite to nationalization were material misrepresentations or omissions in the Explanatory Statement.

It might be argued on a "hindsight" theory that it would have been better practice for RST to have clearly delineated the various stages of this transaction for the shareholders, and to have enabled them to vote separately on the proposals of nationalization and amalgamation. However, after reviewing the testimony carefully and realistically, I cannot conclude that RST's failure to do so amounts to a violation of the securities laws of the United States. This conclusion is reinforced by the sound and compelling practical reasons for not doing so here.

---

rate proxy statements. But that rule has no application to a 10(b) action seeking damages where the issues are whether the plaintiffs did in fact rely, or were in fact misled, and the plaintiffs had knowledge of, or were alerted to, the important facts in question.

Because of the circumstances, nationalization, externalization and amalgamation in fact constituted only one transaction. On August 11, 1969, the Government of Zambia announced that the operating properties of RST would be nationalized and that Zambia would acquire 51% of these assets. It was subsequently discovered that the fair price Zambia had in mind would have returned to the shareholders only about 50% of the book value of the assets they would lose. The non-operating assets of RST consisted mainly of cash, which Zambia coveted in order to bolster its economy. Zambia's intense interest in keeping this cash within Zambia was manifested by the currency exchange controls and the limitation on the payment of dividends to foreign shareholders it had previously invoked. It was obvious that to retain these assets in Zambia would create a serious risk of further nationalization. Even without this risk, RST was severely hampered in its ordinary international operations by these restrictions. Therefore, RST's management concluded that the only possible course of action to follow after nationalization was externalization.

The desire of the Zambian Government to have the nationalization appear voluntary provided the opportunity to secure permission to externalize. In this regard, RST persuaded Zambia to defer nationalization until its shareholders approved, although Zambia would have preferred otherwise. This concession could not be deemed open-ended, or RST would have been able to postpone nationalization indefinitely. However, it did provide a breathing spell during which RST could formulate a plan for externalization.

The testimony in the district court by Sir Ronald Prain, Chairman of RST, Ian MacGregor, Chairman of AMAX, and Robert Page, a director and vice-president of RST, dramatically illustrated the plight of RST; how they were taken by surprise by the Matero Declaration because it represented a reversal of policy of the Government; the urgency with which they had to act; the reasons for deferring nationalization until the shareholders approved; the crippling effect of the Zambian currency restrictions; and the disastrous consequences which would result from remaining in Zambia after nationalization. They further testified that if the shareholders voted against nationalization, the entire transaction would have to have been renegotiated with Zambia, and that less favorable results would probably have been obtained the second time around. This testimony was internally consistent, was never contradicted, and the trial judge in his findings in no way questioned it.

Of course, shareholder approval was not an absolute prerequisite to nationalization. Presumably, the Zambian Government could have nationalized RST at any time and on its own terms. But Zambia had undertaken not to nationalize until the shareholders approved, so to this extent any implication that shareholder approval was required prior to nationalization was the truth. The only way RST could have made this statement more accurate would have been to raise the possibility in the proxy statement that if the shareholders voted not to approve nationalization, Zambia might breach its agreement with RST. Such a course of action would have been most unwise and indeed perhaps foolhardy for corporate officials who had just witnessed their Government's basic change of policy with regard to nationalization itself.

Because the exact timing of the act of externalization was left to the discretion of RST's management, it is technically true that externalization need not have been simultaneous with nationalization. However, the plain fact remains that externalization was the quid pro quo flowing to RST for its not protesting the nationalization. RST fully appreciated the value of its non-operating assets to the Zambian economy, and if RST had been nationalized without condition, Zambia would no longer have had any incentive to abide by the understanding that there could be an externaliza-

tion. The testimony discloses that RST recognized the distinct possibility that were nationalization to occur without externalization, RST could be interminably locked into Zambia with no hope for escape. As the witnesses testified without contradiction, these fears could not have been clearly set forth in the Explanatory Statement without offending the Zambian Government. As a practical matter, then, the timing of the externalization was not in the least discretionary; and to succeed externalization had to be accomplished simultaneously with the nationalization.[48] Accordingly, failure to disclose the technically true state of affairs did not constitute a misleading statement or omission, but revealed the actual state of affairs, and hence could not amount to a violation of Rule 10b-5.

Applying the touchstone of materiality to these two departures from the absolute truth, it becomes apparent that the statements are not material. In order to determine materiality, the question is whether the technically true state of affairs "might have been considered important by a reasonable shareholder who was in the process of deciding how to vote." Mills v. Electric Auto-Lite Co., 396 U.S. 375, 384, 90 S.Ct. 616, 621, 24 L.Ed.2d 593 (1970). If the reasonable shareholder knew that Zambia could nationalize RST even without shareholder approval, and if he knew that Zambia might ignore the understanding permitting externalization were RST to be nationalized first, the reasonable shareholder would be even more strongly inclined to vote in favor of the resolution. Because the shareholders voted overwhelmingly to nationalize and externalize, and not against such course of business, and because the technical truth would have further encouraged such a vote, it can hardly be said that the alleged misrepresentations were material or, in the words of the Fifth Circuit, amounted to "causal

deceit." Herpich v. Wallace, 430 F.2d 792, 801 (1970). Put another way, even if these misstatements were technical violations of Rule 10b-5, they did not cause the transaction to occur nor did they cause injury, and hence no recovery should be based on them. See Note, Causation and Liability in Private Actions for Proxy Violations, 80 Yale L.J. 107, 129–30 (1970).

After deciding that externalization was in the best interests of RST, the management carefully investigated the various methods by which it could be accomplished. At first, reformation of the corporation into an international mining company was seriously discussed, and the proposal was approved by the board of directors. However, this plan was eventually rejected upon further study when it became apparent that it could not succeed, and that as the company's prospects diminished, it would become increasingly subject to raids by others seeking to acquire it at extremely low prices. So pessimistic was the outlook in this respect that Rothschild, who had represented RST for over 30 years, warned that if RST persisted in becoming an international mining company, Rothschild would no longer represent it.

Rothschild advised that RST could not succeed as an international mining company for two compelling reasons: it would not have sufficient income free of Zambian controls to sustain itself while it explored for and developed new mineral deposits, and its credit would not permit it to borrow even one-tenth of the funds necessary to permit such activity. Further to operate as an international mining company, in view of the antitrust laws, RST would have to buy out AMAX's holdings in RST, or AMAX would have to sell its holdings to a third party. But for RST to buy out AMAX would strip it of cash, and AMAX was unable to find a third-party buyer for its RST shares. In addition, the testi-

---

48. It appears that if RST's management had acted otherwise, it might have recklessly breached its fiduciary duties to the shareholders, since the consequences could have been quite damaging and clearly would not have been in the best interests of the company.

mony shows that in either event, a "bail out" by AMAX would have severely undermined the confidence of RST's investors and employees, and would have made it extremely difficult for RST to retain or hire sufficient professional personnel adequately to staff the company.

RST considered the concept of "twinning" the corporation, but counsel advised against this because, without approval from the American Internal Revenue Service, such a reorganization could have burdensome tax consequences for American shareholders. Furthermore, the time required to secure a ruling from the IRS was such that, according to the testimony, Zambia might become impatient and not wait for the required shareholder approval. Therefore, this plan was rejected with the thought that it might be resurrected at a later date if necessary. The majority opinion does not decide whether non-disclosure of these alternate methods of externalization constituted a violation of Rule 10b-5.[49]

Since there was an absence of proof that knowledge of any of these other possibilities would have benefitted the plaintiff class by enabling it to achieve a more advantageous deal by rejecting the proffered proposal, or that insiders would benefit by misleading the shareholders into accepting lesser value for their shares,[50] the non-disclosure of alternative methods of externalization was not a material misrepresentation. No contrary authority has been cited which would support the district court's holding on this point.

Having rejected the various alternatives, the management of RST reluctantly agreed to amalgamation with AMAX. This course of action was designed to be fair to, and yet be beneficial for, both AMAX and the non-AMAX shareholders or RST.[51] Testimony indicated that the terms of the agreement were difficult to work out, and at one point AMAX even proposed an outright distribution of RST's assets remaining after nationalization to the RST shareholders in proportion to their holdings. RST rejected this proposal, and eventually agreement was reached.

The next step in the process was to achieve shareholder approval, and accordingly an Explanatory Statement and other proxy materials were prepared. In the materials, the matters of nationali-

---

49. Significantly these matters were alluded to in Sir Ronald Prain's letter of transmittal. *See infra*, at 295.

50. *See generally*, L. Loss, Securities Regulation 3580–3585 (Supp. to 2d ed. 1969), and cases cited therein.

51. Plaintiff's sole witness attempted to prove that RST's shareholders had been mulcted by this transaction. However, his extremely short direct examination was prefaced with uncertainty:
 "As a business, the intrinsic value, I do not have available appraisals. * * * [I]t would be very difficult to value a package like this. * * * [T]he market value per share * * * is hard to calculate."
 On cross-examination, the witness admitted that in the past ten years, because of the low market value of RST, he had advised only one client to purchase such stock. He admitted that the debentures and warrants to be exchanged for the RST shares would sell on the market at a value of 88 or 90. He further admitted that his basis of calculation of RST's value was not appropriate for use in evaluating an African copper mining company. He stated that he had no prior experience with copper companies, and that he had no direct evidence to support his valuation of RST's exploratory properties. The testimony was hardly such as to create a feeling of confidence, and it is not without significance that the trial judge based no finding upon it.
 In contrast to this testimony, Jacob Rothschild, a director of N. M. Rothschild & Sons, testified in lucid terms that his firm believed the merger to be fair to both RST shareholders and AMAX, and clearly explained the basis for his opinion. Rothschild's testimony was buttressed by that of the head of the financial department of Metallgesellschaft Aktiengesellschaft, the largest West German nonferrous metal producer, by Harold K. Hochschild, Honorary Chairman of AMAX, by a vice-president of AMAX, by a vice-president of Morgan Guaranty Trust Company, by a prominent tax attorney, and by Morris H. Wright, a partner in Kuhn, Loeb & Co.

zation and amalgamation were combined into one proposal. Plaintiff sought to enjoin the distribution of the proxy statements on the grounds they were false and misleading with respect to valuation and the benefits accruing to AMAX. When the district court suggested that plaintiff and defendants produce a joint proxy statement to "avoid the problem of having an ex post facto injunction against the stockholders on the basis of what has been a materially misleading communication," plaintiff replied

"We don't even ask for that much. All we ask is we have the right to set forth our contentions in two pages; and if those two pages are a misrepresentation of our contentions, what has to be changed in them and some idea of where it is going to come, you know, it is not going to be buried down in page 17 to 19 in a 40-page statement so that nobody will even know there is this reference in it.

"I think it should be somewhere where people can see it. I think a page or two which we fairly succinctly summarized what our specific factual contentions are will be something that somebody can read. Then it is up to them. I'm perfectly willing to let them say what they want."

Plaintiff made no mention, at the time of the court's suggestion pertaining to the proxy statement, that he contemplated any problem because the proposals were combined into one question. Indeed, it was not until the "11th hour" meeting that plaintiff raised any question about amalgamation being a consequence of nationalization. And it was not until a further hearing following an appeal to this Court that the matter of the single resolution was raised. At this juncture, the district court stated to plaintiff's counsel: "It seems to me that your * * * contentions in that respect can be succinctly stated in the material that goes out under your name." Despite the fact that this matter was squarely in the mind of plaintiff, and despite the fact that the trial court suggested that it might be included in the

letter to the shareholders, plaintiff made an affirmative decision not to so include it. At one point, the trial judge even conceded that the formulation of the proposal was a matter of business judgment, and that he would not interfere.

With that information as background, we now address ourselves to the proxy materials. Specifically, the question is whether the wording of the Explanatory Statement and formulation of a single proposal was misleading and deceptive as to whether the amalgamation was a natural consequence of the nationalization by Zambia. A close examination of the proxy materials sheds light on this issue.

In the letter of transmittal accompanying the Explanatory Statement, Sir Ronald Prain explained:

"As stated in Paragraph 5 of the Explanatory Statement, I and those of my colleagues on the Board who are not directors of Amax believe that it will benefit you to receive this readily marketable investment in Amax, a large international diversified mining and fabricating enterprise, in exchange for a reduction in your equity interest in the non-diverisified Zambian state mining venture and for an interest in other of the RST assets, most of which have become excess to the needs of the Zambian operations. It would probably have taken considerable time before these assets could have been employed in new mining projects in other parts of the world. Moreover, such projects would undoubtedly have required additional investment and could not have been expected to become income-producing for several years."

The Explanatory Statement itself asserted in its second paragraph:

"This Explanatory Statement describes the proposal of the RST Board that the shareholders of RST approve this sale to Zimco as part of their approval of a reorganisation of the structure of the RST Group. This reorganisation will *also* include a reduction of capital of RST (The "Reduction of Capital"), *resulting, in effect, in the acquisition*

*by American Metal Climax, Inc.* ("Amax") *of part of the RST Group* as a consequence of the cancellation of all shares of RST other than those owned by Amax in exchange for cash, certain assets of RST and $76,166,600 principal amount of Amax subordinated debentures with 761,666 common stock purchase warrants attached." (emphasis added).

To the extent that these statements and those quoted by the majority imply that amalgamation was a natural consequence of nationalization, from a practical standpoint, they do so truthfully. The evidence clearly shows that externalization following nationalization was a business necessity for RST, that there was a need to accomplish externalization immediately, that it was impossible to effectuate other forms of externalization, and that amalgamation was the only viable business method to achieve the required result. Jacob Rothschild testified that his firm advised combining the questions into one proposal to prevent nationalization without externalization because this would have left RST stranded in Zambia. As discussed above, RST could not have further explained its business reasons without assuming the risk of incurring the displeasure of the Zambian Government. After all, RST and its shareholders would still continue to have a substantial stake in that country. Accordingly, the unitary proposal reflected the actual state of affairs as it then existed. Not to have used the unitary proposal would have exposed RST and its shareholders to considerable risk, and therefore did not amount to a violation of Rule 10b–5.

The plaintiff himself was certainly not mislead, and he had ample opportunity to explain to the class, if such were nec-

essary, the implication of the questions involved in the unitary proposal.

Furthermore, with regard to any of the five matters discussed in this subsection, there is not a scintilla of evidence in the record which indicates that the management of RST acted recklessly or in bad faith with regard to their intermediate decisions, or their ultimate judgment as to the working of the Explanatory Statement, or the use of the unitary proposal. As noted above, the district judge at an early stage recognized that these matters constituted a question of business judgment. However, in its opinion, the lower court stated that "[a]fter having heard all of the testimony and reveiewed all of the exhibits * * *," it concluded that the "manner of presenting the proposals was itself a manipulative and deceptive device * *." This assertion,[52] which is found in the opinion as well as in Finding of Fact 102, must be substantiated by evidence of record or it is clearly erroneous. For this purpose, because of the court's statement, we need only examine the exhibits and testimony. And this must be done in light of the majority's reversal of many of the alleged violations of the Act.

The exhibits themselves are, as to be expected, silent as to intent, but reflect the end result of what the defendants intended. Accordingly, the support for the finding must be sought in the testimony of the witnesses. Plaintiffs' witness never testified at all with regard to intent. Defendants' witnesses stated that the purpose of their course of action was to prevent the corporation from becoming locked into Zambia following nationalization. There is no indication that such testimony was incredible, and it was unimpeached. Therefore, it must be accepted as true, and as such, it re-

---

52. There is some question whether this conclusory assertion amounts to a finding of fact at all. Certainly, it is not supported by subsidiary findings as to the factors from which the conclusion is drawn; neither are we directed to any matter in the record which supports the finding. *See* United States v. O'Neill, 411 F.2d 139, 146 (3d Cir. 1969), which holds that Rule 52(a) requires that the trial court shall find the facts specially and "this requirement is not met by the statement of the ultimate fact without the subordinate factual foundations for it which also must be the subject of specific findings."

futes rather than supports the findings of the trial court. But even if such testimony were disbelieved, it was still uncontradicted. The disbelief of the trial judge is not evidence, and will not support the finding of culpability. Consequently, to the extent the district court's ruling that this method of achieving shareholder approval constitutes a manipulative or deceptive device is a finding of fact, it is clearly erroneous; to the extent it constitutes a conclusion of law, it is simply incorrect. There being no tenable determination of culpability, the result reached by the majority amounts to the imposition of liability without fault, and as such is clearly impermissible under the statute and rule.

2. Charges related to "buried facts".

Remaining for determination is the issue whether certain facts were "buried" so as to be the equivalent of nondisclosure or material misrepresentation or omission. The two items so characterized concerned the benefits to be obtained by AMAX, and the fact that RST's banking advisors did not make an independent survey of RST's assets in Baluba and Fiji. It is conceded that these items were disclosed in the Explanatory Statement and its appendices. The sole question is whether a reasonable shareholder, under the circumstances of this case, would have or should have discovered them.

One must exercise care not to view these two items through lenses ground on the basis of "20–20 hindsight". Indeed, since the plaintiff and the court participated in a discussion regarding the draft of the Explanatory Statement, their views expressed before the proxy statement was finally printed will help illuminate this issue.

Plaintiff fully realized the problems confronting the draftsmen of the Explanatory Statement, and before the materials were printed in final form made it clear that he thought it would be sufficient for proxy purposes if the contentions merely were pointed out:

"MR. KOHN: I don't think anyone wants to play games of cat and mouse. We want to get this thing out and done. Nobody wants to spend the rest of his life on this if he can avoid it.

"I think a two or three page statement which we have got summarizes our contentions and labeled our contentions. So to that extent they are harmful to your position if you put them in as yours. They are plainly ours.

"That is all we ask for, with some recognition as to where it is going to be in this overall document, which can be fairly voluminous. You know stockholders and the burdens they have and how much time they can spend reading all these things and so on."

\* \* \* \* \* \*

"THE COURT: It is to notify them not only as to the pendency of the action but \* \* \* the contentions. Most of the facts that appear in this preliminary opinion for all practical purposes are undisputed.

"It seems to me that the stockholders ought to know them."

"MR. KOHN: I would be happy to have no comment from me. Send the complaint and the Judge's opinion out. \* \* \* ".

The Explanatory Statement was printed, and it was not, in the words of the trial judge, until the "11th hour and 59th minute" that plaintiff complained that certain facts were buried. It was after these remarks by the trial judge that the Explanatory Statement was mailed to the shareholders, along with the letter from plaintiff and the court's June 8th opinion, as plaintiff requested.

The first item in the package received by the shareholders was a letter written by Sir Ronald Prain alerting the shareholders to the litigation.[53] This letter

---

53. The text of the letter clearly refers to this litigation:

"We regret that the enclosed material has been delayed by legal proceedings in

---

was added at the last minute in order to comply with plaintiff's request for further emphasis on the litigation. It was followed by another letter of transmittal from Prain summarizing the transaction, which in turn, was followed by plaintiff's letter. Plaintiff's letter further explains the litigation and plaintiff's allegations, and specifically refers the RST shareholders to pages 18 and 19 of the Explanatory Statement. The third paragraph of plaintiff's letter focuses entirely upon the unique benefits to be acquired by AMAX:

"Specifically, it is charged and the Court has found that 'AMAX will receive, inter alia, the following benefits if the Agreement in Principle between RST and AMAX is consummated: (a) AMAX's annual income will be increased by $7 million calculated at $.50 per pound copper price; (b) AMAX's cash flow will be improved by $134 million over the period of 1970–75; (c) AMAX's foreign balance of payments position will be improved by $91 million; (d) although AMAX will increase its net exposure in Africa by about $24 million, 4½ years of incremental earnings after the acquisition will recoup this; (e) AMAX will be acquiring high yielding assets.' "

After the plaintiff's letter was the Explanatory Statement itself. The second paragraph of that document concluded with the following information:

"Appendices to this Explanatory Statement provide more detailed information concerning the proposal. Information and notices concerning judicial proceedings in the courts of Zambia and a class action in the United States of America appear in Paragraphs 18 and 19."

In section 18 of the Explanatory Statement, which appears on pages 18 and 19, the pending litigation was fully described. The fifth paragraph of that section, dealing with the June 8th preliminary injunction opinion of the district court, stated: "The findings of fact, conclusions of law, opinion and order of the Court are set forth in Appendix R hereto." And in paragraph 28 of the district court's order, set forth on page 5 of Appendix R of the Explanatory Statement, the following findings of fact are recited:

"AMAX will receive, inter alia, the following benefits if the Agreement in Principle between RST and AMAX is consummated:

(a) AMAX's annual income will be increased by $7 million calculated at a $.50 per pound copper price;

(b) AMAX's cash flow will be improved by $134 million over the period of 1970–1975;

(c) AMAX's foreign balance of payments position will be improved by $91 million;

(d) Although AMAX will increase its net exposure in Africa by about $24 million, 4½ years of incremental earnings after the acquisition will recoup this;

(e) AMAX will be acquiring high yielding assets." (Footnote and citations to exhibits omitted).

If the assumption that the reasonable shareholder reads proxy materials is correct, then where the proxy materials disclose a lawsuit which could be of great financial benefit to the shareholder, it follows a fortiori that the shareholder would read the information concerning the lawsuit. But even if the shareholder relied on other sources of information such as a stock analyst in chosing how to

the United States initiated by a shareholder *attacking the proposal* being presented to you.
"The Court in the United States, in order to assure that *this material adequately presents the plaintiffs' contentions,* has conditioned the mailing of this material on our inclusion of a letter from

the attorney for the plaintiffs in this proceeding. However, the Court has specifically stated that requiring the inclusion of that letter 'does not constitute a finding by the Court that the allegations made herein are true.' " (Emphasis added).

vote, the information regarding the advantages to AMAX clearly was available to such source and would have been reflected in the advice rendered to the shareholder.

The fact that some of the information is contained in an appendix rather than in the text is not significant here, for the purpose of appendices is to remove detailed facts from the Explanatory Statement proper. The procedure of utilizing appendices in transactions as complex as this is common. If each and every fact contained in the appendices were in the body of the Explanatory Statement, then it would be so large and unworkable that a serious question of "buried facts" would be presented.

The majority opinion notes that Rule 14a–5, 17 C.F.R. § 240.14a–5, dealing with proxy statements, discourages incorporation by reference in a proxy statement of important facts. There is no dispute with such rule and its application so as to require a corporation to distribute a proper proxy statement. But the precise point here is whether the shareholders were misled in not knowing what benefits AMAX was to receive as a result of the transaction. If the reasonable shareholder in fact was plainly apprised of what AMAX was to receive as a result of his attorney's letter and also as a result of the clear findings of the trial judge that were included with the letter and proxy material, it does not appear to be logical, nor in accord with the real purpose of Rule 14a–5, to ignore this information in determining whether the corporation should respond on the ground that it misled its shareholders.

The last of the 10b–5 violations sustained by the majority concerns the in-

adequate disclosure of the fact that Kuhn, Loeb, Rothschild and Lehman Bros. did not perform an independent survey of the mining properties, mineral reserves and exploration rights of RST.[54] It appears that the main thrust of this alleged violation goes to the valuation ascribed to the Fiji project, a project which had been underway for approximately six months prior to the events in question here.[55]

On page 2 of the Explanatory Statement, the following paragraph appears in bold faced type:

"N. M. Rothschild & Sons and Kuhn, Loeb & Co. have both confirmed to RST that, in their opinions, the terms of the Reduction of Capital are fair and equitable to the shareholders of RST. Lehman Brothers have confirmed to AMAX that, in their opinion, the terms of the Reduction of Capital are fair and equitable to AMAX and its shareholders. A copy of the opinions of these bankers may be found in Appendix Q."

The reasonable shareholder, put on notice of this litigation charging basic unfairness, would or should have turned to Appendix Q, since fairness to RST shareholders should have been the crucial factor in deciding how to vote.

Appendix Q consists of three short letters from the three investment advisors.[56]

Rothschild stated, in the second of three paragraphs:

"In our opinion, the proposal is fair and equitable as between Amax on the one hand and the other shareholders of RST on the other. In appraising the proposal we have assumed the accuracy of all the information and

---

54. This allegedly buried fact was not called to the attention of either the court or defense counsel before the Explanatory Statement was printed, although plaintiff was apparently aware of it.

55. RST held nothing more than an exploration license for the Fiji Islands area. The investment bankers valued this license at $600,000, the amount RST had in-

vested in the project. Only preliminary surveys had been performed and although some indicated the presence of mineral deposits, nothing was known of their size, richness, or susceptibility to being mined.

56. Were the disclaimers buried in lengthy technical reports, a more serious question would be presented.

statements contained in the Explanatory Statement. *We have not made an independent survey of the RST Group's mining properties, mineral reserves or exploration rights.*" (emphasis added).

Kuhn, Loeb prefaced its opinion with the following statements:

"In considering the fairness of such proposed transaction, we have relied on the accuracy of the statements contained in the Explanatory Statement. *We have not made an independent appraisal of RST's mining properties, mineral reserves and exploration rights,* but we have however taken the values of such mining properties, mineral reserves and exploration rights into consideration on the basis of opinions expressed by technical and geological personnel of RST." (emphasis added).

Lehman Brothers, the firm advising AMAX, explained:

"Our analysis is based on the material set forth in the Explanatory Statement dated 30th June, 1970, and assumes that this material is accurate. With respect to RST, *we have made no detailed survey of its mining properties and mineral reserves,* but have relied on the opinions furnished by technically qualified personnel of RST and Amax." (emphasis added).

The witnesses testified that before preparing the evaluations and letters, they closely questioned RST's management and personnel, and were satisfied that those persons had exercised "due diligence" in discovering and reporting the extent, nature, and value of these mining properties, mineral reserves and exploration rights. Whether these firms were ultimately right or wrong as to valuation is one matter, but it is clear that this is not a case in which plaintiff even claimed that RST concealed physical assets. Moreover, plaintiff does not charge that a physical inspection would have produced a different result. Accordingly, it is questionable whether omission of the fact that the investment bankers had not made an independent survey would be material. But even if it were, in view of the reference to the appendix and the statements contained therein, this information was hardly buried.

The transaction *sub judice* was a very complex matter, and was rendered even more complicated by the pendency of this lawsuit. In order fully to describe it and the various assets of RST that would be affected, an Explanatory Statement, disclosing thousands of facts, consisting of 24 pages of text and 20 appendices was prepared. From this vast compilation, attention is called to a limited number of items which we are told constitute "buried facts". Nowhere has the district court found that the draftsmen had submerged these items in order to deceive or mislead; nowhere is there a suggestion or finding of an intent to bury; nowhere is there a finding of bad faith or recklessness. The implication is merely that these few items should have been presented or highlighted in a manner other than that utilized.

Because these alleged buried facts were disclosed so that a reasonable shareholder could have or should have had actual knowledge of them, application of the objective test of reliance forecloses predicating relief upon subjective reliance on their non-existence.

With regard to buried facts, the admonition of the majority that "[r]easonable latitude in this area is important if nit-picking is not to become the name of the game" is particularly appropriate. To allow recovery on the facts here would only encourage shareholders to examine proxy statements and other documents with a fine-tooth comb—nit-picking, as it were—so that they could construct law suits out of very slight factual misstatements or omissions.

For these reasons, in addition to those set forth at length above, I would hold that no 10b–5 violations have been established in this case.

## III. THE EFFECT OF THE ZAMBIAN DECREE

I agree with the majority that the case of Canada S. R. Co. v. Gebhard, 109 U.S. 527, 3 S.Ct. 363, 27 L.Ed. 1020 (1883) is controlling on the question of the effect to be given the decree of the High Court of Zambia. There, plaintiffs were American bondholders in a Canadian railroad undergoing reorganization in accordance with a special act of Parliament. Pursuant to the plan of reorganization, the railroad substituted a new bond issue for the old. Plaintiffs, however, refused to surrender their old bonds, and sued when the old bonds and interest coupons became due. The Supreme Court held that an act of a foreign government which was valid under the law there in force is binding on a corporation domiciled in that nation, the power of the domiciliary nation over corporations organized under its law being plenary. The Court reasoned that such a corporation is subject to all the control and direction that may be properly exercised over it at the place of its erection, and that every person who deals with a foreign corporation impliedly subjects himself to the laws of the foreign government which regulate the corporation. The Supreme Court concluded: "[A]nything done at the legal home of the corporation, under the authority of such laws, which discharges it from liability there, discharges it everywhere." *Id.* at 538, 3 S.Ct. at 370. "The true spirit of international comity requires that schemes of this character, legalized at home, should be recognized in other countries." *Id.* at 539, 3 S.Ct. at 371.[57]

Of course, the securities laws of the United States had not been enacted in 1883. Nevertheless, assuming that such laws render *Gebhard* inapposite, the same result may be achieved by the application of choice of law principles, as will be demonstrated below.

Section 27 of the Securities Exchange Act of 1934 vests in the federal courts "exclusive jurisdiction of violations of this title or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this title or the rules and regulations thereunder."

Accordingly, to the extent that the Zambian decree purports to decide Section 10(b) or Rule 10b–5 questions *vel non*, the federal courts are not precluded from examining such issues *de novo*. For example, had the High Court of Zambia attempted to apply the standards of Section 10(b) or Rule 10b–5 to the Explanatory Statement, and then resolved that the Section or Rule had not been violated, the federal courts would nonetheless be able to determine independently whether any or all of the elements of a 10(b) or 10b–5 violation had occurred, although collateral estoppel might apply to the facts, *simpliciter*, determined in the Zambian proceeding. *See* Abramson v. Pennwood Investment Corp., 392 F.2d 759, 762 (2d Cir. 1968).

However, such is the beginning rather than the end of the inquiry regarding the effect of the Zambian decree. This is so because even assuming a finding of a transgression of the federal securities laws, the court must then fashion an appropriate remedy. Of course, the underlying fairness of the transaction is an important consideration. *See* Mills v. Electric Auto-Lite Co., 396 U.S. 375, 386, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). Although federal courts must "provide such remedies as are necessary to make effective the congressional purpose" of the Securities and Exchange Act, J. I. Case Co. v. Borak, 377 U.S. 426, 433–434, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964), it does not follow that the congressional purpose will be frustrated if decisions on non-federal claims determined in non-federal courts may be per-

---

57. This case is apposite here despite the lack of a judicial decree because the Court analogized the legislative proceeding to American bankruptcy laws, and in par-

ticular, to the English reorganization procedure which was quite similar to that currently in force in Zambia.

suasive as to the scope of relief in the federal cause of action. *See* Klein v. Walston & Co., 432 F.2d 936 (2d Cir. 1970). Indeed, this Court has recognized the importance of state law with regard to fairness in 10b–5 actions. *See* Levin v. Great Western Sugar Co., 406 F.2d 1112 (3d Cir. 1969).

Furthermore, count II of plaintiff's complaint, in alleging breach of fiduciary duties, states a common law cause of action that the federal court here has authority to adjudicate through the doctrine of pendent jurisdiction. *See* United Mineworkers of America v. Gibbs, 338 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Lowenfels, Pendent Jurisdiction and the Federal Securities Acts, 67 Colum.L.Rev. 474 (1967); Note, The Evolution and Scope of the Doctrine of Pendent Jurisdiction in the Federal Courts, 62 Colum.L.Rev. 1018 (1962). It is clear that when a court is examining the rights, duties and liabilities between or among a corporation, its directors, officers, and shareholders, the applicable law is that of the state of incorporation *E.g.*, Zahn v. Transamerica Corp., 162 F.2d 36 (3d Cir. 1947).[58] In Hausman v. Buckley, 299 F.2d 696 (2d Cir.), cert. denied, 369 U.S. 885, 82 S.Ct. 1157, 8 L.Ed.2d 286 (1962), it was held that the Venezuelan substantive law was applicable to determine whether shareholders had the right to object to certain action taken by officers and directors where the company was incorporated in Venezuela and had its shareholders meeting there, although Americans controlled the company and all the parties to the action were Americans.

In this case, the decree of the Zambian High Court would be an accurate barometer of the Zambian law as applied to the facts of this amalgamation. Therefore, we must determine the effect of the Zambian judgment, for if it is controlling as to the issue of the fairness of the merger to the RST shareholders, the district court would be precluded from re-examining that issue, even though plaintiff's relief under the securities law might thereby be foreclosed.

Of course, tribunals in this nation are not absolutely bound to follow foreign judgments in every case. In Hilton v. Guyot, 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895), the Supreme Court ruled that foreign judgments were binding in courts of this country as a matter of international comity if certain criteria are satisfied. Summarized, they are:

1. Opportunity for a full and fair trial abroad;

2. Trial before a court of competent jurisdiction;

3. Trial conducted upon regular proceedings;

4. Proceedings following due citation or voluntary appearance of adversary parties;

5. Trial under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries;

6. No evidence to demonstrate

 (a) prejudice in the court,

 (b) prejudice in the system of laws in which court was sitting;

 (c) fraud in procuring the judgment; or

 (d) any other special reason why the comity of this nation should not allow full effect. Id. at 202–203, 16 S.Ct. 139.

This Court recently explained the importance of comity in holding that an English judgment, rendered after a defendant was duly notified and declined to appear, was enforceable in the federal

---

**58.** However, the law of the state of incorporation need not be applied to intra-corporate matters where there are no other contacts with that state but incorporation. Mansfield Hardwood Lumber Co. v. Johnson, 268 F.2d 317 (5th Cir. 1959). In this case RST has substantial additional contacts with Zambia. Its officers and principal places of business are there, its shareholder meetings are held there, and it is subject to Zambian regulation.

courts. In so doing, we concluded: "Comity should be withheld only when its acceptance would be contrary or prejudicial to the interest of the nation called upon to give it effect." Somportex Ltd. v. Philadelphia Chewing Gum Corp., 453 F.2d 435, 440 (3d Cir. 1971) (footnote omitted), cert. denied, 405 U.S. 1017, 92 S.Ct. 1294, 31 L.Ed.2d 479 (1972).

### A. Element of Reciprocity.

In Hilton v. Guyot, enforcement in the federal courts of an executory French judgment for the recovery of money was denied by the Supreme Court because France would not enforce an American judgment without first examining the merits of the controversy.[59] But on the same day that *Hilton* was decided, the Supreme Court enforced an executory Canadian money judgment, holding that by the law of England, prevailing in Canada, a similar United States judgment would be enforced in Canada. Ritchie v. McMullen, 159 U.S. 235, 16 S.Ct. 171, 40 L.Ed. 133 (1895).

Plaintiff has urged that there is a substantial question whether Zambian courts would afford recognition to a judgment of a United States court. However, no cases, statutes or treatises, Zambian or otherwise, have been brought to our attention in support of such proposition. On the other hand, we may assume that Zambia would recognize a judgment rendered in an American court. Zambia was formerly a British protectorate and decisions rendered by English courts are authoritative precedents in Zambia. Changes in sovereignty do not affect changes in local common law unless such law is affirmatively altered by the new government.[60] Since English courts grant reciprocity to judgments rendered by courts of the United States,[61] the assumption that Zambian courts would do so also is not unreasonable.[62]

Having decided that the reciprocity factor is not a bar to the recognition of the Zambian decree, the next inquiry is whether the other criteria of Hilton have been satisfied.

### B. Opportunity for a full and fair trial abroad.

The Zambian Companies Ordinance does not on its face grant standing to shareholders, as distinguished from creditors, to object to a reduction of capital of their corporation. However, the Zambian Ordinance was drawn from the British Companies (Consolidation) Act of 1908, and is similar to the current English statute, the Companies Act of 1948. The Companies Act also does not purport on its face to vest standing in shareholders to object to a reduction of capital, but it has long been held that the courts must be solicitous of the rights of shareholders.[63] The appropriate method

---

59. No federal court in a diversity action has required that the reciprocity rule of *Hilton* be followed. Restatement (Second) of Conflicts, § 98, comment e (1971). And the courts of New York have disregarded the reciprocity rule entirely. Cowans v. Ticonderoga Pulp & Paper Co., 219 App.Div. 120, 219 N.Y.S. 284, aff'd, 246 N.Y. 603, 159 N.E. 669 (1927).

60. Panama R. Co. v. Bosse, 249 U.S. 41, 39 S.Ct. 211, 63 L.Ed. 466 (1919); Vilas v. Manila, 220 U.S. 345, 31 S.Ct. 416, 55 L.Ed. 491 (1911); Ortega v. Lara, 202 U.S. 339, 342, 26 S.Ct. 707, 50 L.Ed. 1055 (1906); 1 Hyde, International Law 396 (3d ed. 1945).

61. *See* Ritchie v. McMullen, *supra*. *See generally*, Huntington v. Attrill (1893)

Appeal Cases 150; *cf.* Re Judgment Debtor (No. 2176 of 1938), [1939] 1 All. E.R. 1.

62. In any event, this may not be a factor, particularly in view of the questionable vitality of the reciprocity rule of *Hilton*. *See* fn. 57 *supra*. *See also*, Somportex Ltd. v. Philadelphia Chewing Gum Corp., 453 F.2d 435, n. 8 (3d Cir. 1971).

63. Bannatyne v. Direct Spanish Telegraph Co. (1886), 34 Ch.D. 287; Poole v. National Bank of China, Ltd., [1907] A.C. 229; [1904–7] All E.R. 138 (H.L.); Ex parte Westburn Sugar Refineries, Ltd., [1951] A.C. 625; [1951] 1 All E.R. 881 (H.L.).

for a shareholder to object to a reorganization would be to appear at the hearing.[64]

That the High Court of Zambia rendered its judgment within three hours from the time the proceeding commenced does not demonstrate that a full and fair hearing was not held in view of the fact that the court had all of the materials, including the complete record of the proceedings below, for consideration well in advance of the hearing date. To some extent, the brevity of the proceedings was attributable to the fact that no one appeared to object to the amalgamation. That the decree was, in effect, entered by default does not automatically vitiate it. Restatement (Second) of Conflicts, § 98, Comment i (1971); *see* Somportex Ltd. v. Philadelphia Chewing Gum Corp., *supra.*

### C. *Trial before a court of competent jurisdiction.*

The Zambian Companies Ordinance, §§ 14–18, vests jurisdiction to approve reductions of capital in the High Court of Zambia. Therefore, that court was competent to hear the matter and to adjudicate it. British and American Trustee and Finance Corporation v. Couper, (1894) Appeal Cases 399 (H.L.). There is no suggestion in the record that the High Court lacked competence to approve this reorganization.

### D. *Trial conducted upon regular proceedings.*

RST's petition for confirmation of its reduction of capital was held on August 14, 1970, before the Honorable S. W. Magnus. There is no indication of any irregularity in the proceedings.[65] Mr. Justice Magnus had available, in addition to the proxy materials, the records of

the shareholders' votes, Mr. Kohn's letter containing the various objections, the briefs, motions, pleadings, transcripts, exhibits, and the opinions filed in the action brought in the district court. These documents clearly alerted the High Court to the various contentions of unfairness and allegations of illegality and breaches of fiduciary duty. On that record and the testimony of partners in Cravath, Swaine & Moore and in Kuhn, Loeb, the High Court confirmed the reorganization, expressly holding that it was "fair and reasonable to all the shareholders of the Company."

### E. *Proceeding following due citation.*

Plaintiff was given personal notice of the hearing in the High Court and of his right to attend and object. At one point, the district judge specifically requested plaintiff to consider attending. In addition, full notice of the hearing, of the shareholders' rights, and of the binding effect of the judgment of the High Court appeared in the proxy materials as well as in leading newspapers in America, London, Zambia, and Johannesburg. This elaborate notification appears to comply fully with the due process requirements promulgated by the Supreme Court in Mullane v. Central Hanover Bank and Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). Plaintiff made an advertent decision not to attend the hearing, and no valid justification for such refusal appears in the record.

### F. *Trial under a system of jurisprudence likely to secure an impartial administration of justice.*

The record shows that Zambia is governed in accordance with a constitution approved by the British and Northern Rhodesian governments prior to its be-

---

64. The fact that Zambian provisions for discovery and presentation of documentary evidence vary from those of the federal courts is immaterial to the decision whether the Zambian judgment should be recognized so long as the Zambian procedures were followed. *See* Hilton v. Guyot, *supra.*

65. Mr. Justice Magnus has practiced as a barrister in London, and has served in the territorial legislature of Northern Rhodesia and in the National Assembly of Zambia. Prior to his appointment to the bench, he had served as Queen's Counsel, a signal honor. He is the co-author of the leading Engish treatise on corporation law, Magnus & Estrin, Companies Law and Practice (4th ed. 1968).

ing granted independence. The judiciary consists of the Court of Appeals, the High Court, and subordinate and local courts. In many respects, the legal structure of Zambia is similar to that of Britain. Many of the laws of Zambia have been drawn from British counterparts, and in the absence of express change, British common law is controlling. The Zambian law governing the fiduciary duties of a corporation, its officers, directors and shareholders, and the concept of fairness, is not substantially different from that of either Brittain or the United States. Specifically, in a reorganization of this nature, the High Court, despite its wide discretion, must be satisfied that the plan is fair and equitable to all shareholders before it may confirm the plan. British and American Trustee and Finance Corporation v. Couper, (1894) Appeal Cases 399 (H.L.); Magnus & Estrin, Companies Law and Practice (4th ed. 1968). There is nothing here which indicates that the Zambian system of jurisprudence would be unfair to non-Zambians asserting claims in the Zambian courts.

G. *No evidence to demonstrate prejudice in the court or fraud in the procuring of the judgment.*

The record is completely barren of even a suggestion that the High Court of Zambia was prejudiced in favor of the RST management or against any group of shareholders. Nor is there any evidence of direct fraud upon the Zambian court resulting in the judgment under consideration here. The Supreme Court has stated that these matters must be proved by competent evidence, and that mere conclusory allegations are insufficient to attack a foreign decree. Ritchie v. McMullen, 159 U.S. 235, 16 S.Ct. 171, 40 L.Ed. 133 (1895). Even assuming that the shareholder vote was procured by fraud, such fraud would not contaminate the decree since all of plaintiff's allegations and the record of the district court were before the High Court prior to its decision.

Similarly, there is no evidence of prejudice against non-Zambians intrinsic to

Zambian laws or jurisprudence or in any other regard. Nor has there been demonstrated any special reason why the Zambian judgment ought not be accorded the comity of the United States. Furthermore, since federal courts may look to local law regarding matters of fairness and Zambian law with regard to fairness and fiduciary responsibilities is not materially different from ours, it surely has not been demonstrated that the acceptance of comity would be contrary or prejudicial to the interest of this nation.

Accordingly, the district court should have recognized the judgment of the High Court insofar as it determined the fairness of the amalgamation. The remaining question of this inquiry is the extent to which the Zambian decree estops shareholders from complaining about the fairness of the transaction. The Restatement of Conflicts indicates that "[n]ormally an American court would apply the foreign rules as to these matters if these rules are substantially the same as the rules of the American court." Restatement (Second) of Conflicts, § 98, Comment f (1971).

The Zambian Companies Ordinance provides that if no appeal is taken, the order of the court confirming the reorganization and a minute showing of the details shall be registered by the Registrar of Companies, and "his certificate shall be conclusive evidence that all the requirements of this Ordinance with respect to reduction of share capital have been complied with * * *". § 19(4). This is comparable to Section 69(4) of the Companies Act of 1948. Section 69(4) has been interpreted to bar attack on a reduction of capital where a company had no power under its articles of incorporation to reduce capital, Re Walker and Smith Ltd. (1903), 72 L.J. Ch. 572, or where a special resolution authorizing reduction of capital had not been properly passed, Ladies' Dress Association v. Pulbrook [1900] 2 Q.B. 376 (C. A.). The conclusiveness of the Registrar's certificate reaches all matters concerned with the reduction of capital.

Walker v. Peterson, (1933) South African Law Reports (Appeals Division) 23.[66]

The conclusion that the decree bars further inquiry on the merits is essentially similar to the results reached in this country in reorganization proceedings under the Bankruptcy Act or the Public Utilities Holding Company Act of 1935, where it has been held that a final decree of a reorganization court binds all shareholders, whether or not they appeared in the court, Chicot County Drainage District v. Baxter State Bank, 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329 (1940), or whether they subsequently allege that the officers and directors of the corporation had formulated and obtained approval of a fraudulent reorganization plan. Nichols v. Alker, 231 F.2d 68 (2d Cir.), cert. denied, 352 U.S. 829, 77 S.Ct. 42, 1 L.Ed.2d 51 (1956). In King v. Realty Mortgage Co., 107 F.2d 90 (5th Cir. 1939), cert. denied, 309 U.S. 673, 60 S.Ct. 712, 84 L.Ed. 1018 (1940), it was held that a preferred shareholder who was notified of each step in a receivership proceeding, and who made no objection during dissolution and reorganization, could not thereafter attack the proceedings and decrees in subsequent suits. Therefore, there does not appear to be any policy reason which would dictate the non-application of Zambian law as to the effect of its decree.

For these reasons, plaintiff should be estopped by the Zambian judgment from asserting any unfairness in the amalgamation transaction. Thus even if violations of the federal securities laws have been established, both logic and comity require that the cause be remanded to the trial judge to fashion relief not inconsistent with the Zambian determination of fairness.

## IV. FURTHER HEARINGS ON REMEDY

The entire panel agrees that the district court should hold no further hearings on remedy. However, the issue of the propriety of the district court's order directing such hearings despite the stipulation is of such importance that it merits some discussion.[67]

On the day set for trial, while the jurors were being selected, the district court suggested that if the parties would agree to a waiver of trial by jury, he would sever the issues of liability and damages. It was in this setting that the defendants responded they would waive a jury trial only if the issues of damages and liability would be tried together. The parties then entered into a written stipulation, specifically approved by the judge, whereby the jury trial was waived on condition that the matter be heard and determined in a "single unitary final hearing." [68] Based on this written understanding, the case was tried and the "single unitary final hearing" was concluded on November 3, 1970, when all parties rested. The record was officially closed on November 16, 1970 because of some questions regarding documents.

66. The same result is reached by applying the English doctrine of "issue estoppel." *See* Heystead v. Comm'r of Taxation, (1926) Appeal Cases 155; Carl Zeiss Stifting v. Rayner & Keller Ltd. No. 2, (1967) Appeal Cases 853.

67. This matter was argued vigorously before us. And since there is a strong likelihood that in a case of this importance petitions for rehearing en banc or for certiorari will be filed, I feel constrained to set forth my views on this subject for whatever value they might be to the reviewing tribunal.

68. The text of the stipulation is as follows: "It is hereby agreed by and among counsel for American Metal Climax, Inc., Roan Selection Trust, Ltd., RST International, Inc. and counsel for plaintiffs that their respective demands for jury trial of this action, which has been severed from plaintiffs action against the remaining defendants herein, are withdrawn upon condition that:
 '(1) All issues pending in this action between plaintiffs and American Metal Climax, Inc. and Roan Selection Trust, Ltd. and RST International, Inc., be heard and finally determined by this Court in a *single unitary final hearing* before any issues between plaintiffs and the remaining defendants are tried.'" (emphasis added).

The district court filed its opinion and order on November 25, 1970. AMAX and RST filed their notices of appeal from the judgment on December 2, 1970, within the allowable period.[69] On December 3, 1970, plaintiff filed a "Motion to Amend and Supplement the Judgment", under Rule 59(e) of the Federal Rules of Civil Procedure. At this point, it was clear that all parties considered the district court's order of November 25, 1970, to be a judgment.[70] This Court then remanded the cause to the district court to allow it to rule on plaintiff's motion.[71] The district court granted plaintiff's motion and entered a series of orders amending the judgment of November 25, 1970, one requiring a further hearing as to damages and other relief.[72] It is the order requiring a further hearing on damages to which defendants object.

It is a well-recognized rule of law that valid stipulations entered into freely and fairly, and approved by the court, should not be lightly set aside. *E. g.* Fenix v. Finch, 436 F.2d 831 (8th Cir. 1971); Henry v. Comm'r, 362 F.2d 640 (5th Cir. 1966); Barstein v. United States, 232 F.2d 19 (8th Cir. 1956). In exceptional circumstances, parties may be relieved of their stipulations to prevent manifest injustice. Fenix v. Finch, *supra*, Henry v. Comm'r, *supra*. Nevertheless, where a stipulation has more than one material part, one such portion may not be deleted and the remainder of the stipulation enforced. Appropriate relief in such a case is to restore the parties to their original positions prior to the entry into the agreement.[73] A & A Sign Co. v. Maughan, 419 F.2d 1152 (9th Cir. 1969); Morse Bougler Destructor Co. v. Camden Fibre Mills, Inc., 239 F.2d 382 (3d Cir. 1957).

*Morse Bougler* indicates that a stipulation may be set aside and the parties returned to their original position, if it can be shown that the stipulation had been entered into inadvertently, inadvisedly or improvidently, and would operate unjustly and to the prejudice of a party. However, no such showing has been made here.[74]

Having specifically approved the stipulation waiving trial by jury on condition there be a "single unitary final hearing" the district court was precluded from holding additional evidentiary hearings. The "single unitary final hearing" contemplated when the parties agreed to the stipulation ended in November, 1970, when the parties rested, the record was closed, and the judgment was filed. Therefore, to hold supplementary hearings would clearly violate the stipulation, and create a serious question whether defendants' Seventh Amendment right to a trial by jury—the right which they clearly had before the stipulation was

---

69. Had they not done so, this Court might have been without jurisdiction to hear the appeal from the judgment of liability. Fed.R.App.P. 4(a). There is nothing in the Federal Rules of Appellate Procedure which would require, or in any way encourage, parties desiring to appeal to wait until the last day of the period in which to file notice of appeal before such filing.

70. That defendants considered the order a judgment is evidenced by the filing of the notice of appeal. The language of plaintiff's motion in the district court indicates that he was of the same view. And in his motion and brief to this Court to remand to the district court, plaintiff characterized his motion as a "post-trial" proceeding.

71. By its order of January 8, 1971, directing that the district court enter its "amended judgment" within eight days, this Court also considered the district court's order to be a judgment, and not a mere interlocutory order.

72. That the district court also considered its opinion and order of November 25, 1970, to be a judgment is indicated by the fact that it entitled the document it filed on January 15, 1971, "Memorandum and Order Amending Judgment."

73. Because the trial proceeded on the basis of the stipulation, and trial strategy and tactics were predicated thereon, the only way the parties could be restored to their original positions would be to grant a new trial with a right to a jury determination of all the legal issues. Neither plaintiff nor defendants have asked for such relief here.

74. In addition, both parties indicate that justice may be done without a remand for further hearings on damages.

entered into and which they gave up solely in exchange for a "single unitary final hearing"—would thereby be infringed.[75]

The record is unequivocal that defense counsel desired a single hearing as to liability and damages, such as they would ordinarily have before a jury. Defendants apparently did not want to risk defending the damage segment of the proceedings separately, because to do so would place them at the tactical disadvantage of having been adjudged tortfeasors. Certainly, it must have been in counsel's mind that if RST and AMAX were found to have violated the law in a manner associated with a lesser degree of culpability than outright fraud, a trier of fact would undoubtedly keep such degree of culpability in mind in determining the severity of the remedy. Passage of time, however, might operate to obliterate or dim in the mind of the trial judge any such differentiation. And it was obviously within the contemplation of defense counsel that if there were a judgment of liability in a trial bifurcated as to culpability and remedy, defendants would be met at the outset of the segment on damages with the awesome burden of those who had already been adjudicated transgressors and had gone to an appellate tribunal to complain about the trial judge's verdict or rulings.[76]

Accordingly, even if there were a valid holding that the securities acts had been violated, I agree with the majority that the amendatory orders, to the extent they contemplate any further hearing on damages, should be reversed.[77]

## V. REMEDY

The remedy approved by the majority raises several troublesome questions. Essentially, that remedy is the same as was originally fashioned by the district court after the trial of this matter. But the district court's remedy was predicated on a holding that defendants had committed extensive violations of Rule 10b-5, and that the amalgamation was unfair. However, the majority has reversed many of the 10b-5 violations, and has held that the district court should have accepted the Zambian determination of fairness. Since the foundation for the district court's remedy has to a large degree been eroded, it would appear to be better practice to remand the matter to the district court to reconsider the remedy in light of the majority opinion and what remains of the underlying structure.

In approving the remedy, the majority relies on Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).[78] In *Mills*, the Supreme Court noted with approval that "nothing in the statutory policy 'requires the court to unscramble a corporate transaction merely because a violation occurred.' 403 F.2d at 436". *Id.* at 386, 90 S.Ct. at 622. The Court further recognized

---

**75.** Of course, if defendants brought about the fragmentation of the proceedings themselves, they could not be heard to assert that their rights were thereby violated. But, they did not. If anyone fragmented the trial, it would be the plaintiff, who rested his case on the assumption he had adequately proved the measure of his damages or his entitlement to other relief, which position he reiterated on appeal.

**76.** Furthermore, nothing in the limited remand by this Court authorized the district court to hold supplementary hearings in derogation of the stipulation. The fact that the amendment process was limited to 8 days indicates that neither this Court nor the parties contemplated further hearings. Since we retained jurisdiction except to allow the district court to rule on the motion to amend and supplement the

judgment within a certain period of time, the action of the district court beyond the scope of the authority conferred by the remand would therefore be void. *See* United States v. Mayer, 235 U.S. 55, 35 S.Ct. 16, 59 L.Ed. 129 (1914); Thompson v. Harry C. Erb, Inc., 240 F.2d 452, 454 (3d Cir. 1957).

**77.** The determination of counsel fees was postponed by agreement of counsel until after the various appeals were decided, and is therefore not affected by the stipulation requiring a "single unitary final hearing."

**78.** Even though Mills is a proxy case rather than a 10b-5 case, and the "relief" portion of the opinion is dicta, it is nonetheless instructive as to the appropriateness of the remedy here.

that a "merger should be set aside only if a court of equity concludes, from all the circumstances, that it would be equitable to do so." *Id.* at 388, 90 S.Ct. at 623. With regard to monetary relief, the Court stated that where "the misleading aspect of the solicitation did not relate to terms of the merger * * * damages should be recoverable only to the extent that they can be shown." *Id.* at 389, 90 S.Ct. at 624.

Here, the majority specifically holds that the findings it affirmed "do not relate to the terms of the merger", and that "the district court was in error to the extent it determined that damages should be awarded on the basis of its finding that the amalgamation was unfair." *Ante* at 270. In such a case, *Mills* teaches that "relief might be predicated on a determination of the fairness of the terms of the merger at the time it was approved." 396 U.S. at 389, 90 S.Ct. at 624. Accordingly, it would seem that since the majority held that the Zambian decree forecloses inquiry into the fairness of the transaction, the relief approved by the majority might be inappropriate.

In addition, *Mills* recognized that other factors might govern the relief to be granted. One such factor not foreclosed by *Mills* is whether the relief would be unfair to stockholders or to other innocent third parties who relied on the validity of the corporate action. *See* The Supreme Court, 1969 Term, 84 Harv. L.Rev. 1, 214 (1970).

In evaluating the fairness of the remedy to the stockholders of RST, it must be remembered that two-thirds of the non-AMAX shareholders approved the amalgamation. Presumably, some of them will desire to proceed with the merger according to its original terms—that is, they will exchange their RST shares for the AMAX package of securities. But the original terms of the amalgamation were based on AMAX achieving absolute ownership of RST's externalized and undistributed assets. However, if even one shareholder decides instead to avail himself of the remedy approved by the majority opinion, then AMAX would have to treat RST International as a subsidiary company with a separate corporate existence that would have to be respected. AMAX could not treat RST International's assets as its own without again going through a formal merger procedure, and again running the risk of serious litigation. And until such a merger were consummated, AMAX would be deprived of flexibility in the use of RST International's assets. The problem of remedy is further exacerbated by the fact that many of RST's shareholders are foreign nationals who are outside the protection of the American securities laws, *see* 309, 310, *infra*; shareholders with respect to whom no laws may have been violated, and who therefore may be treated as innocent third parties.

The majority opinion here holds that the only effect of the violations which were affirmed was that "they may have influenced the stockholder vote regardless of the fairness of the amalgamation." Accordingly, in view of the above discussion, it would appear that it would be more appropriate for the district court to order a resolicitation of proxies of the non-AMAX shareholders on the issue whether the amalgamation should be consummated or whether RST International should continue its corporate existence.[79] The district court's order could require that the proxy materials accurately describe the nature of the device, that the advantages and disadvantages of each course of action be fully explained, and that the "buried" facts be adequately highlighted, all in accordance with the majority opinion. Such a course of action would do much to alleviate the inequities of the remedy that was approved, especially where, as here, the element of culpability is either absent in its entirety, or at most present in an extremely attenuated state.

There is another aspect of the relief granted by the majority that I find dis-

---

79. Professor Loss reasons that if a court has the power to unscramble a merger, *a fortiori*, it may order lesser relief. 5

L. Loss, Securities Regulation 2926 (Supp. to 2d ed. 1969).

turbing. It would seem that the holding of Canada S. R. Co. v. Gebhard, 109 U.S. 527, 3 S.Ct. 363, 27 L.Ed. 1020 (1883), as applied to the facts of this case, would bar any plaintiff from a cause of action in the federal courts were it not for the effect of the Securities Exchange Act of 1934. That Act imposes certain duties on all corporations that would transact business of the sort at issue here by use of American stock exchanges or American instrumentalities of foreign or interstate commerce. But the extraterritorial effect of an Act of Congress is circumscribed; it may not regulate the conduct of a foreign corporation in a foreign country where there is no nexus with the United States. *See* American Banana Co. v. United Fruit Co., 213 U.S. 347, 29 S. Ct. 511, 53 L.Ed. 826 (1909). Thus, a Zambian citizen and resident who had purchased his shares of RST in Zambia and who had received the Explanatory Statement through the Zambian postal system would be outside the protection of the American securities laws, and would not have rights which could be vindicated under those laws in the courts of the United States. This principle would also apply to other foreign shareholders who could not establish the necessary jurisdictional connection with the United States. The rights of these shareholders are dependent upon the securities laws of the nations where acts with respect to them occurred.

Yet, the remedy of the district court, as approved by the majority, indiscriminately extends to all shareholders of RST, including those with absolutely no association with this country. If in fact the legal rights of foreign shareholders, as established by the securities laws of the relevant foreign nation, have been violated by this transaction, then the remedy to be afforded such shareholders must be fashioned with reference to the applicable foreign law, and not the American securities acts. Accordingly, the

remedy here, to the extent it goes beyond the resolicitation described *supra*, should be limited so that it would inure only to the benefits of those members of the plaintiff class who could establish standing with respect to the jurisdictional requirements of Section 10(b).[80] At the very least, the district court should consider this matter.

## VI. CONCLUSION

Looking then at this matter in broad perspective, we find the following: Zambia, an emerging African nation, suddenly advises a Zambian corporation that the country plans to nationalize its copper mines located there. The corporation is able to negotiate, as the quid pro quo for a business-like nationalization, an understanding that it will be permitted to re-organize itself in such way so as to remove from Zambian controls the corporation's substantial liquid assets. After a lengthy series of conferences, participated in by internationally recognized legal and investment banking counsel, it is concluded that the most prudent course, and perhaps the only realistic procedure, is to have the Zambian corporation sell its externalized assets to its largest stockholder in exchange for a package of securities plus cash, admittedly valued higher than the market value of such stock. A public announcement to this effect is then made.

At this point, a skilled lawyer who purchased 2000 shares of stock of the Zambian corporation less than three months earlier, while the negotiations were under way, files suit to enjoin the merger, based on the proposition that it will be a violation of the antitrust laws, it will be unfair because of the fiduciary relationships between the officers of the acquiring and selling corporations, and that a release advising the public of the exchange constituted a violation of the securities laws. The district court refuses to grant injunctive relief, but permits

---

80. Assuming that the non-federal claims of shareholders without standing under Section 10(b) were otherwise properly before the court under diversity or pendent jurisdiction, application of either the Securities Exchange Act remedy or relief under "some other corporate fiduciary law" would be barred by the *Gebhard* doctrine as applied by the majority. *See ante* at 309.

the Zambian corporation to proceed with the preparation of a proxy statement, and its distribution to the shareholders together with the findings by the court and a letter by the plaintiff setting forth his contentions why the merger would be improper and unfair to the shareholders. There is then an "11th hour" effort by plaintiff to enjoin the vote by the shareholders and to enjoin the determination by the Zambian Court of the propriety and fairness of the reorganization.

The complete plan of reorganization, plaintiff's complaint, the entire record in the injunctive proceeding, the proxy statement, and the material prepared by plaintiff in connection therewith are submitted to the Zambian Court. That Court, utilizing a judicial procedure akin to that used in Britain, then approves the nationalization and merger, and specifically finds that the merger is fair to the shareholders.

Thereafter the lawsuit that had been instituted in the district court goes forward. The only direct evidence presented by plaintiff consists primarily of an estimation of damages by a witness who concededly has very limited experience with the copper industry, in general, and the two companies involved here, in particular. The officers who negotiated the transaction and representatives of the legal and investment firms who supervised it testify at length and under rigorous cross-examination regarding the reasons for each step that had been taken and the values assigned.

The district court does not find that there had been any intent on the part of the defendants to defraud the stockholders and indeed no intent to cause any harm whatsoever. Nevertheless, it finds that there should be liability predicated on the fact that the resolution submitted to the stockholders should not have been a unitary proposition, but rather should have been sub-divided into two parts; that the consideration to be received by AMAX was not set forth with sufficient prominence in the proxy material; and that the statement by the investment bankers that they had used *investment valuations* in appraising the assets in the Fiji Islands and Baluba and did not make a *physical appraisal* of them, were contained in opinion letters in the appendix as distinguished from being set forth in the text of the proxy statement. The district court refuses to attach any legal significance to the Zambian decree, and makes no reference to the fact that plaintiff had been shown the proxy statement before it was distributed and given an opportunity to state his comments regarding it to the shareholders, at defendants' expense, was aware of the unitary nature of the resolution and did not call it to the attention of the shareholders.

The majority opinion, by simply announcing that fraud had been found, would impose liability on the defendants despite the fact that the legislative and administrative history of the Act and Regulation, relied upon for liability, make it clear that neither Congress nor the SEC intended to create a violation in the absence of culpable conduct.

The decision which the majority promulgates today ignores the basic realities in negotiating a transaction of this magnitude and then preparing the necessary legal documents to communicate with the stockholders. In truth, it will make most difficult the accomplishment of the very concept utilized by the majority in fastening liability, the promotion of a free flow of information to shareholders. Instead, it might well create an atmosphere of perplexity around the preparation of proxy statements not conducive to the free flow of information. It will encourage a practice to develop by which one will obtain a proxy statement or prospectus, frequently prepared under the stress of time and circumstances, and review each sentence and assertion on a hindsight basis, rather than with the more limited vision of foresight, and file a lawsuit based essentially on relatively minor discrepancies and on the ground that culpable practices by the defendants are irrelevant, and reliance by shareholders is beside the point.

For all these reasons, I would reverse the district court and enter judgment for the defendants.

# APPENDIX

## ELEMENT OF CULPABILITY IN 10b-5 AND RELATED CASES*

| Name of Case & Citation | Nature of Cause of Action | Decision on Pleadings or Merits | Formulation Regarding Culpability | Remarks |
|---|---|---|---|---|
| Troutman v. United States, 100 F.2d 628 (10th Cir. 1938) | Criminal prosecution for use of mails in furtherance of a scheme to defraud and for violation of §17 of 1933 Act by misrepresentation. | Judgment of conviction affirmed. | Intent must be alleged and proved. Evidence was admissible "for the purpose of shedding light upon the good faith or bad faith with which the plan to sell the stock was formed." | Language of §17 was later incorporated into Rule 10b-5. |
| Rice v. United States, 149 F.2d 601 (10th Cir. 1945) | Criminal prosecution for use of mails to defraud by violating §17 of 1933 Act by misrepresenting the projected size of the venture, its financial strength, income and dividend history, etc. | Judgment of conviction affirmed. | Intent to defraud is an essential element of the offense. It may be inferred from the circumstances, which could show knowledge of the misrepresentation and thus intent. | |
| Kardon v. National Gypsum Co., 69 F. Supp. 512 (E.D. Pa. 1946) | Private action for damages arising out of sale of stock to persons in control of corporation who made false or misleading statements. | Motion to dismiss complaint denied. | ". . . [t]he specific section in question provides for the elimination of all manipulative or deceptive methods. . . ." | First case finding implied private right of action. For decision on the merits, see 73 F.Supp. 798. Face to face transaction. |
| Fischman v. Raytheon Mfg. Co., 188 F.2d 783 (2nd Cir. 1951) | Private action for damages arising out of untrue statements in a prospectus or registration statement. | Dismissal of complaint reversed. | "Proof of fraud is required in suits under §10(b). . . ." "[W]hen, to conduct actionable under §11 of the 1933 Act, there is the added ingredient of fraud, then that conduct becomes actionable under §10(b). . . ." | |
| Matheson v. Armbrust, 284 F.2d 670 (9th Cir. 1960) | Individual shareholder's action to cancel sale of stock to him and for damages, where sale was prompted by gross misstatements concerning the financial condition and earnings of the company. | Judgment for plaintiff affirmed. | Defendant intentionally undertook and practiced a scheme to defraud plaintiff. | Primary issue was not fraud, but whether use of a telephone was a sufficient connection with an instrumentality of interstate commerce. Face to face transaction. |

*Cases listed in chronological order.

LA56701

# APPENDIX

## ELEMENT OF CULPABILITY IN 10b-5 AND RELATED CASES*

| Name of Case & Citation | Nature of Cause of Action | Decision on pleadings or merits | Formulation Regarding Culpability | Remarks |
|---|---|---|---|---|
| Ellis v. Carter, 291 F.2d 270 (9th Cir. 1961) | Private action for damages arising from a joint venture to acquire control of a corporation, wherein defendants misrepresented that if plaintiff purchased shares at prices higher than market value, he would thereby obtain a voice in management | Motion to dismiss complaint. | Congress intended absolute liability for material misrepresentations. Opinion relies on Matheson v. Armbrust, supra, but Matheson did not address itself to question of culpability. | Case indicates, however, that proof of fraud could be relevant to a judgment on the merits. Face to face transaction. |
| Royal Air Properties, Inc. v. Smith, 312 F.2d 210 (9th Cir. 1962) | Private action for damages arising out of purchase of stock in corporation building apartments based on misleading prospectus which omitted reference to certain costs and debts of the corporation. | Judgment entered for defendant. | Court, in dictum, stated that fraud need not be alleged nor proved, relying on Ellis v. Carter, supra. | Facts indicate that Defendants had actual knowledge of omissions. Case held that reliance, estoppel, waiver and laches were valid defenses. Face to face transaction. |
| Kohler v. Kohler Co., 319 F.2d 634 (7th Cir. 1963) | Private action for damages arising from sale of stock to close corporation based on misrepresentations and omissions. | Judgment for defendant affirmed. | Statute "meant to cover more than dishonestly misrepresenting or omitting material facts . . ." Accounting procedures adopted without intent to deceive need not be justified unless the failure to do so is motivated by bad faith. Mere error in estimation is not a basis for recovery. Standard is fair play. | Case frequently cited for proposition that culpability is not an element. No breach of duty by accountant who, in negotiating the sale, did not disclose accounting methods, even though other methods would result in a higher valuation. Face to face transaction. |
| SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180 (1963) | Government injunctive action under Investment Advisors Act of 1940 to compel registered advisor to disclose to customers his practice of buying securities, recommending purchases by clients, and then selling at a profit when clients' purchases caused increase in price | Appeal from denial of preliminary injunction hearing | It would defeat intent of Act to enjoin certain practices "to require proof of intent to injure and actual injury to clients." Congress intended to adopt a definition of fraud which encompasses breach of fiduciary duties and obligations of utmost good faith. | Based on fiduciary relationship of advisor and client. Court relied on modern common law formulations of fraud. |
| United States v. Benjamin, 328 F.2d 854 (2nd Cir.) cert. denied, 377 U.S. 953 (1964) | Criminal prosecution of accountant for violation of Securities Act of 1933, involving false descriptions of assets of corporation. | Appeal from criminal conviction. | Falsity coupled with culpable state of mind. Defendant guilty if he "deliberately closed his eyes to facts he had a duty to see." | Congress did not intend criminal liability for mistakes of attorneys or accountants. |

*Cases listed in chronological order.
[A5671]

# APPENDIX

## ELEMENT OF CULPABILITY IN 10b-5 AND RELATED CASES*

| Name of Case & Citation | Nature of Cause of Action | Decision on Pleadings or Merits | Formulation Regarding Culpability | Remarks |
|---|---|---|---|---|
| Trussell v. United Underwriters, Ltd., 228 F. Supp. 757 (D. Colo. 1964) | Private action by purchasers of stock against sellers for damages, where sellers affirmatively misrepresented future worth, etc., and failed to disclose adverse factors. | Motion to dismiss complaint granted in part. | Scienter must be alleged and proved. Promissory fraud is actionable. Intent is necessary to a "scheme to defraud." The burden is greater than under §12(2) of the 1933 Act. "The statutory language . . . implies conduct which is, at the very least, either knowing or intentional." Reckless disregard for truth or falsity or constructive fraud would be sufficient. | Under 1934 Act, no liability for complete non-disclosure absent a fiduciary relationship. Scienter is required because the civil action is implied from the criminal provisions. |
| Weber v. C.M.P. Corp., 242 F. Supp. 321 (S.D.N.Y. 1965) | Private action for damages resulting from sale of stock by corporation | Motion to dismiss complaint granted in part. | Must be scienter in some form. To predicate relief on innocent or negligent misrepresentations would add remedy not contemplated by Congress in sections 11 and 12 of Securities Act of 1933, which allows absolute liability in some circumstances. | Counts alleging scienter are sufficient. |
| Stevens v. Vowell, 343 F.2d 374 (10th Cir. 1965) | Pirvate action to recover amount paid for purchase of stock in corporation to be formed, where fraud went to ownership of an invention as well as to intent to build archery lanes. | Judgment for plaintiff affirmed. | In what appears to be dicta, court said: "It is not necessary to allege or prove common law fraud . . .". | Case implies absolute liability for material misrepresentation, but facts demonstrate conduct from which scienter could be inferred. Face to face transaction. |
| Parker v. Baltimore Paint & Chemical Corp., 244 F. Supp. 267 (D. Colo. 1965) | Action by reorganization trustee of debtor corporation to rescind sale of securities, where purchaser misused its power to bring about a merger and to deprive seller of the fruits of the transaction | Judgment for defendant. | Scienter required, "malice aforethought." | Relies on Trussell v. United Underwriters, Ltd., supra, and declines to follow what it describes as dicta in Stevens v. Vowell, supra. |
| A. T. Brod & Co. v. Perlow, 375 F.2d 393 (2nd Cir. 1967) | Action by stockbroker against customer for failure to pay for securities ordered by customer | Trial court dismissed complaint because fraud not spelled out. | Although plaintiff might be able to prove nothing more than breach of contract, it is sufficient to allege "fraudulent intent." | This case does not eliminate element of culpability; merely holds that it is sufficient to have it. Face to face transaction. |

*Cases listed in chronological order.

[A5672]

**APPENDIX**

**ELEMENT OF CULPABILITY IN 10b-5 AND RELATED CASES***

| Name of Case & Citation | Nature of Cause of Action | Decision on Pleadings or Merits | Formulation Regarding Culpability | Remarks |
|---|---|---|---|---|
| Mutual Shares Corp. v. Genesco, Inc., 384 F.2d 540 (2nd Cir. 1967) | Shareholders' action for injunctive relief and damages resulting from manipulation of price by controlling shareholders to gain control of corporation in order to divert its assets. | Appeal from dismissal affirmed in part and reversed in part. | Allegation of "[d]eceitful manipulation of the market price" by withholding dividends is sufficient to state a claim for injunctive relief. | Where plaintiffs' retained their stock, claim for damages properly dismissed for insufficient causal connection between the manipulation by Defendants and the sale of stock to Defendants by others. |
| Myzel v. Fields, 386 F.2d 718 (8th Cir. 1967) *cert. denied,* 390 U.S. 951 (1968) | Private action for damages arising from sale of stock in close corporation where corporation did not disclose increased sales, increased profits, and other critical facts. | Judgment for plaintiffs affirmed. | Proof of "knowledge of the falseness of the impression produced by the statements or omissions made" is not required. | Suit involving small corporation, where there had been face to face dealing. Jury instruction requiring "*intent* of inducing Plaintiffs to sell their stock" did not prejudice Defendants as it was more demanding than the statute requires. |
| Pappas v. Moss, 393 F.2d 865 (3rd Cir. 1968) | Derivative action for damages based on sale of treasury stock to corporate directors and others at price below market price. | Finding of liability against defendants reversed and remanded. | Where directors are alleged to have caused their corporation to sell its stock at a fraudulently low price, a violation of Rule 10b-5 is asserted. | Court of Appeals repeatedly emphasized the element of fraud. |
| SEC v. Frank, 388 F.2d 486 (2nd Cir. 1968) | Government *injunctive action to restrain, pendente lite,* attorney from drafting documents describing chemical product because the documents are false or misleading. | Appeal from summary grant of injunction | Attorney would be liable for assisting in circulating statement "he knows to be false," and cannot "escape liability for fraud by closing his eyes to what he saw and could readily understand." | Case strongly implies that attorney would not be liable for errors resulting from mere negligence in translating technical reports into ordinary English, but recklessness would be sufficient. Injunction dissolved on other grounds. |
| SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (2nd Cir. 1968), *cert. denied,* 394 U.S. 976 (1969) | Government injunctive action against corporation and insiders based on material omissions coupled with insider trading | Trial court found that 2 defendants violated Rule, but dismissed as to others. Court of appeals affirmed as to the 2, and reversed as to the others. | (1) As to individual defendants, good faith not a complete defense. Scienter includes lack of diligence, constructive fraud, or unreasonable or negligent conduct. (2) As to corporate defendant, lack of due diligence, absent a showing of bad faith, is sufficient to state cause of action. | Case did not specifically decide that scienter is not required to support a private damages action. Friendly, J., concurring expressed grave doubt whether standard should be lowered from that of "recklessness that is equivalent to wilful fraud." |

*Cases listed in chronological order.

[A5673]

## APPENDIX

### ELEMENT OF CULPABILITY IN 10b-5 AND RELATED CASES*

| Name of Case & Citation | Nature of Cause of Action | Decision on Pleadings or Merits | Formulation Regarding Culpability | Remarks |
|---|---|---|---|---|
| Heit v. Weitzen,<br><br>402 F.2d 909 (2nd Cir. 1968) | Private action for damages arising from purchase of debentures based on misleading financing statements failing to disclose that income resulted from overcharges | Reversed dismissal of complaint. | Allegation of actual knowledge of falsity is sufficient. | The actual allegation was that Defendants "knew or should have known that . . . [the financial statements] were incorrect and false and misleading." Indicates that culpability still considered an element in the Second Circuit. |
| Globus v. Law Research, Inc.,<br><br>418 F.2d 1276 (2nd Cir. 1969), cert. denied, 397 U.S. 913 (1970) | Shareholders' action for damages charging that a circular issued by underwriter contained material omission | Judgment for plaintiff affirmed in part and reversed as to punitive damages. | Actual knowledge of falsity or that omission, if disclosed, would have shown statement to be misleading. | Jury trial; issue whether instructions were correct. Charge upheld where there was accusation of actual knowledge, evidence supporting the accusation and jury found "high moral culpability." |
| Herpich v. Wallace,<br><br>430 F.2d 792 (5th Cir. 1970) | Shareholders' action seeking damages and injunctive relief arising from sale of control by majority shareholder and merger of corporation | Trial court dismissed complaint. Appellate court reversed in part and affirmed in part. | Allegations of a "broad scheme to defraud" resulting in merger are sufficient; as are allegations of facts amounting to "caused deceit." | See also, Shell v. Hensley, 430 F.2d 819, 824 (5th Cir. 1970) (allegation of fraudulent activity). |

*Cases listed in chronological order.

CA56743